UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| JANE DOE AND JOHN DOE, | ) | |
| as Next Friends of | ) | |
| JANE DOE II, a Minor, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. |
| v. | ) | 1:23-cv-2666-SCJ |
| | ) | |
| FOUNDING FOURTEEN, INC., | ) | |
| ANNETTE HIGGINS, and | ) | |
| STAN J. BEINER, | ) | |
| | ) | |
| Defendants. | ) | |

## AMENDED COMPLAINT

Plaintiffs file this amended complaint pursuant to this Court's order, Doc. 30, extending the time for Plaintiffs to respond to Defendants' motions to dismiss or to amend their complaint until September 12, 2023.

## PARTIES

1.    Jane Doe and John Doe are parents of minor Jane Doe II. As a result of the highly sensitive and personal nature of the facts in this Complaint, Plaintiffs' full identities have been concealed from public court filings.

2.    Plaintiffs are citizens of the United States and residents of the State of Georgia.

3.    Defendant Founding Fourteen, Inc., is a Georgia nonprofit corporation that contracted with Fulton County Schools and the Georgia State Board of Education to operate the Fulton Academy of Science and Technology ("FAST").

4.    Defendant Founding Fourteen, Inc., owns and operates FAST, which is a local charter school. FAST is the only school owned and operated by Founding Fourteen, Inc.

5.    Defendant Annette Higgins ("Higgins") was principal of FAST from the school's opening in 2016 until the end of the 2017-2018 school year. She is sued in her individual capacity.

6.    Defendant Stan Beiner ("Beiner") was principal of FAST, a position he began with the 2019-2020 school year. He is sued in his individual capacity.

**JURISDICTION AND VENUE**

7.    This Court has original jurisdiction over Plaintiffs' Section 1983 claims because they arise under the Constitution and laws of the United States. 28 U.S.C. § 1331; U.S. Const., Amend. 14; 42 U.S.C. § 1983.

8.    This Court has original jurisdiction over Plaintiffs' Title IX claims because they arise under the Constitution and laws of the United States. 28 U.S.C. § 1331; U.S. Const., Amend. 14; 20 U.S.C. § 1681(a).

9.    This Court has supplemental jurisdiction over related state law claims

pursuant to 28 U.S.C. § 1367.

10.    Venue is proper in the Atlanta Division of the United States District Court for the Northern District of Georgia as a substantial part of the events and omissions giving rise to the claims in this action occurred in Fulton County, Georgia, which is encompassed within the Atlanta Division of the Northern District of Georgia.

## **FACTUAL ALLEGATIONS**

### *FAST Organization*

11.    FAST is a local charter school in the Fulton County public school system. FAST was created by Founding Fourteen, Inc., in 2016.

12.    FAST's charter, *i.e.*, the agreement with the County under which it operates, is attached as Exhibit 1.

13.    During all relevant times, June Erickson and Joseph Akpan were FAST Board Members.

14.    FAST is a school that teaches students from kindergarten through eighth grade.

15.    FAST retains full discretion and decision making regarding the day-to-day operations of the school.

16.    Day-to-day operations at FAST are overseen by the school principal.

The school principal has the authority to discipline, suspend, remove, reassign, and terminate a FAST teacher.

17.   FAST's operations are otherwise overseen by a governing board which is comprised of the Founding Fourteen, Inc.'s board of directors.

18.   But for those aspects of school operation mandated by law, FAST is an autonomous, private corporation which provides public educational services.

*FAST hires Robert Vandel as Science Teacher*

19.    In 2017, FAST hired Robert Allen Vandel as a science teacher.

20.   When FAST hired Vandel as a middle school science teacher, Principal Higgins and the FAST administration knew that Vandel had a well-established and documented work history of sexual harassment and abuse of middle school students. These reports stemmed from Vandel's previous employment at Midland Middle School in 2003.

21.   Principal Higgins' and FAST's knowledge was based on a pre-employment background check and other official records that were read and reviewed by Higgins and other FAST administrators before Vandel was hired.

22.   FAST vests final decision making authority as it relates to teacher hiring, discipline, and firing with its principal.

23.   The previous reports of Vandel's previous sexual harassment and abuse

were supported by accounts from fourteen teachers and seven students. These reports were known to FAST and its administrators and final decision makers. FAST and Higgins knew that the reported conduct included:

a. Grooming and creating relationships of intimacy and trust with minor female students (including using candy, favoritism, isolation, and inappropriately sexual and familiar interactions to groom young girls);

b. Giving certain students flirtatious, sexually suggestive, and inappropriate nicknames (such as "cutie pie," "flirt," "care bear," and "perv");

c. Making overt sexually suggestive and harassing comments to students and teachers;

d. Touching minor female students inappropriately and sexually, including massaging their shoulders, touching their inner thighs, and touching their buttocks;

e. Suggesting minor female students call him outside of school hours;

f. Inviting minor female students to his home to pick up personal gifts, candy, etc., when his wife was not home;

g. Grabbing a student's thigh and making sexually suggestive remarks;

h. Giving a student the nickname "Cutie Pie" and giving her "back rubs"

i. Giving female students including preferential treatment, wrapping his

arms around female students' waists, and making sexually suggestive

remarks regarding female students;

j.  Hitting a student on the behind with a ruler; and

k.  Isolating female students for extended periods of time.

24.   Principal Higgins and FAST knew that, as a result of Vandel's conduct

at Midland Middle School, he was arrested and charged with four counts of sexual

battery and one count of simple battery against his students.

25.   In the wake of his arrest and reports of his sexual harassment and

assault of his students, Vandel resigned from Midland Middle School.

26.   FAST and Higgins also knew that in 2006, the Georgia Professional

Standards Commission ("GPSC") released the findings of its investigation into

Vandel's conduct. The GPSC determined that the student and teacher witnesses

were credible and that Vandel's defenses were not credible.

27.   FAST and its decision makers also knew an Administrative Law Judge

of the Office of State Administrative Hearings determined that Vandel "committed

clear violations" of the Code of Ethics for Educators Standard 2 ("Abuse of

Students") "by failing to maintain a professional relationship with his students and

by repeatedly engaging in sexually harassing behavior through his words and

actions," and Standard 10 ("Professional Conduct") "by engaging in conduct that

seriously impaired his ability to function professionally in his employment position
. . . [and] was detrimental to the health, welfare, discipline and morals of his
students." Consequently, Vandel's teaching certificate was suspended for eighteen
(18) months. That suspension was later increased to 2 years.

28.    FAST policies require fingerprinting, background checks, and a pay-
for-service investigation search engine for all hires. Defendants FAST, Higgins,
and Beiner knew of Vandel's history of misconduct and discipline. Those
Defendants did not doubt the veracity of any of those reports and had no reason
whatsoever to believe that Vandel had been falsely accused.

29.    Despite Vandel's documented history of grooming, sexually harassing,
and sexually assaulting minor female students and female teachers, prior criminal
charges and convictions, prior discipline for showing up at school under the
influence of alcohol, findings of violations of the Code of Ethics for Educators, and
multiple teaching Certificate suspensions, Defendants FAST and Higgins hired
Vandel to work as a middle school science teacher at FAST starting in the 2017-
2018 school year.

*The 2017-2018 School Year*

30.    The 2017-2018 school year was Jane Doe II's first year at FAST.

31.    In August 2017, Jane Doe II was a happy, 11-year-old sixth grader

7

enrolled at FAST, who did well in school and loved ballet.

32.   During Vandel's first year at FAST, his pattern of grooming, sexual harassment, and sexual assault continued. His reported behavior was almost identical to his behavior at Midland Middle School.

33.   When the school year started, Vandel quickly took a fancy to Jane Doe II and began perpetrating a pattern of grooming behavior. That behavior continued over the course of two-and-a-half school years.

34.   In 2017, Vandel started by calling Jane Doe II nicknames, like "Blondie" and "Ballerina," giving her "high-fives" in the school hallways, pulling her pigtails, treating her special, and giving her extra attention.

35.   Principal Higgins received multiple additional reports of this behavior from other teachers who observed Vandel's harassing conduct.

36.   Principal Higgins ignored those reports in the same way as she did the previous year.

37.   FAST's board members were also aware of ongoing reports of Vandel's misconduct because they were communicated directly to them by teachers and other administration.

38.   At the time Principal Higgins ignored those reports, she knew of Vandel's extensive history of sexual misconduct with young female students

stemming from the time he was hired.

39.   Vandel continued his pattern of abuse and grooming while teaching at FAST. His conduct included:

a.  Grooming and creating relationships of intimacy and trust with minor female students (including using candy, favoritism, isolation, and inappropriate sexual and familiar interactions to groom young girls).

b.  Giving certain students flirtatious, sexually suggestive, and inappropriate nicknames.

c.  Making overt sexually suggestive and harassing comments to students and teachers.

d.  Touching minor female students inappropriately and sexually, including massaging their shoulders, touching their inner thighs, and touching their buttocks.

e.  Suggesting minor female students call him outside of school hours.

f.  Inviting minor female students to his home to pick up personal gifts, candy, etc., when his wife was not home.

*The 2018-2019 School Year*

40.   During the 2018-2019 school year, Jane Doe II was twelve years old and a seventh grade student at FAST.

9

41.   The principal of FAST during the 2018-2019 fall semester was Christopher Mahoney.

42.   The principal of FAST during the 2018-2019 spring semester was Ashley Stinger.

43.   Vandel's inappropriate conduct continued to escalate when Jane Doe II was placed in his seventh grade science class.

44.   Now that Vandel had daily contact with Jane Doe II, he singled her out by showering her with favoritism and gifting her with extra candy, ice cream, money, and personal, typed notes.

45.   During the 2018-2019 school year, Vandel's harassment of Jane Doe II became physical. At least once a week, he began rubbing her shoulders and pulling her hair from behind while she was in his classroom.

46.   As a result of Vandel's overt grooming tactics, other students began bullying and ridiculing Jane Doe II while she was at school.

47.   Bullying against Jane Doe II was widely observed by FAST teachers and FAST administrators.

48.   During the 2018-2019 school year, a teacher ("Teacher 1") at FAST and a former principal at another Atlanta school, reported Vandel's inappropriate conduct to Principal Stinger.

49.    The information reported by that teacher included:

a.  Vandel's sexual harassment and comments about students and other teachers;

b.  Vandel's comments about tight jeans;

c.  that Vandel regularly gave minor female students candy and ice cream, which was against FAST's official school policy.

50.    Principal Stinger did not discipline Vandel for his sexual harassment, or for violating school policy.

51.    Instead, Principal Stinger ignored Teacher 1's reports and punished her for reporting the ongoing misconduct.

52.    Teacher 1 was deeply concerned that the school and administration were allowing Vandel to be alone with minor female students and, as a result, withdrew her own daughter from enrollment at FAST.

53.    In March 2019, Teacher 1 emailed FAST board members and reminded them that Vandel had a documented case of inappropriate conduct with teenage girls, that teenage girls were remaining in Vandel's teaching area during recess and lunch with no other adult present, that Vandel was continuing inappropriate conduct with young female students, and that other teachers had seen Vandel's inappropriate conduct with female students.

11

54.    The next day, on March 25, 2019, Principal Stinger and FAST Board Member Akpan notified Teacher 1 that the "FAST administration" determined to place her on leave until her final date of employment and instructed her not to return to campus for any reason, even to tell her students and colleagues goodbye. In addition, Principal Stinger and FAST Board Member Akpan notified Teacher 1 that FAST would be deducting $1,000.00 from her final paycheck for failing to provide a 60-day notice of her resignation.

55.    Teacher 1 reported Vandel's inappropriate behavior because she was alarmed by it, yet she was ultimately punished for doing so. Teacher 1 observed that no one would say anything about Vandel after they saw what happened to her.

56.    In spite of that email reminding the FAST administration and Board Members of Vandel's history of sexual misconduct, and ongoing reports of continued misconduct, the FAST administration, including its principals and its governing board, did nothing to intervene. Instead, FAST's administration told that teacher that she was being too dramatic.

57.    Teacher 1 ultimately resigned from her employment with FAST as a result of FAST's retaliation against her.

58.    The reaction to Teacher 1's report mirrored FAST's response to other complaints dealing with the safety of women and girls. For example, a minor

female student told other students she was going to kill them. In connection with her mandatory reporting duties, and so as to not lose her teaching certification, Teacher 1 reported the incident to FAST administration and told the student's mother about what had been said. Principal Stinger and the FAST administration got upset with her for telling the girl's mother about the incident because it was the school's custom to keep these types of details from students' families.

59.    Vandel's behavior otherwise continued to be widely recognized at FAST as problematic by numerous teachers and administrators.

60.    During his time as principal, Mahoney heard complaints about Vandel and learned of Vandel's previous misconduct and discipline by the GPSC.

61.    Principal Mahoney shared all of this information with FAST board members and specifically with June Erickson who disagreed with firing Vandel.

62.    Instead of firing Vandel, FAST continued to do nothing except to downplay the conduct, ignore the conduct, and belittle those who reported it.

63.    In 2019, Vandel's teacher's certification was suspended by GPSC for showing up at school after drinking and smelling heavily of alcohol. Several female teachers reported Vandel for this incident, which Vandel admitted.

*The 2019-2020 School Year*

64.    The principal of FAST during the 2019-2020 school year was

Defendant Beiner and the vice principal was Peter Epstein.

65.   During the 2019-2020 school year, Jane Doe II was thirteen years old and an eighth grade student at FAST.

66.   At the beginning of the school year, Defendant Beiner knew there had been numerous reports of Vandel's inappropriate conduct with female students, knew of Vandel's history of sexually inappropriate conduct, knew that Vandel had been isolating female students and providing them with treats and favors, knew that Vandel had made inappropriate sexual comments about both teachers and staff, and knew that Vandel presented an ongoing risk to female students.

67.   Defendant Beiner knew this information because it was general knowledge, he heard reports about Vandel's conduct, and he reviewed Vandel's teaching history.

68.   Defendant Beiner knew that Vandel was generally regarded as inappropriate with young female students and that there was a reasonable basis for this belief.

69.   Although Principal Stinger previously did nothing to stop Vandel's conduct, she warned Defendant Beiner that he should move Vandel's classroom into the main building so that Vandel had more supervision and was not alone with any young girls.

70.    Principal Stinger made that warning because she believed that Vandel presented a threat to the safety of the students.

71.    For example, Principal Stinger (and all other principals and FAST board members) knew that Vandel had young female students in his classroom, which was a temporary trailer detached from the main school building with no other adults present.

72.    Defendant Beiner understood that the outgoing principal was telling him that Vandel presented a threat to the safety of young female students at the school.

73.    Defendant Beiner, along with FAST's board members, continued to do nothing in spite of this knowledge.

74.    As Jane Doe II entered the eighth grade, Defendant Beiner continued to allow Vandel to manipulate his position of trust in order to groom, sexually harass, and sexually abuse Jane Doe II. Jane Doe II was placed in Vandel's homeroom class, in addition to being in his science class.

75.    Vandel's interactions quickly escalated into more overt sexual contact, including squeezing and caressing her shoulders, reaching down near her breasts, and letting his hand linger on her body. At times, Vandel squeezed her shoulder so hard that it hurt. This inappropriate physical contact occurred repeatedly and on a

consistent basis, up to three or four times a day, during the school year.

76.    Vandel continued to make sexually inappropriate contact with and comments to Jane Doe II. For example, he pulled her out of her classroom, cornered her in the hallway, and told her she had the most beautiful eyes he had ever seen.

77.    In one incident, Vandel smacked Jane Doe II on the buttocks in the front of the classroom as she bent down to pick up a piece of paper. When she turned around, she saw Vandel smiling at her.

78.    On yet another occasion, Vandel leaned over Jane Doe II while she was taking a test and fondled her arm, pulling her arm hair in a manner that was painful for her. After staring at her arm in disbelief and discomfort, Jane Doe II looked up to see multiple classmates staring back with concern.

79.    Vandel's unwanted and inappropriate attention toward Jane Doe II was the subject of considerable gossip among classmates and led to Jane Doe II's increased harassment, bullying, and cyber bullying by her fellow students at FAST.

80.    Throughout October and November of 2019, Jane Doe II's parents— who were then unaware of Vandel's ongoing sexual harassment—emailed the FAST Administration on multiple occasions about the constant bullying and sexually harassing behavior that other FAST students inflicted upon Jane Doe II

and requested support from the school.

81.   In response, the FAST administration failed to acknowledge, investigate, or address their repeated concerns. Those concerns were directly related to the sexual harassment by Vandel.

82.   In late 2019, multiple male students approached a teacher ("Teacher 2") at FAST, on three separate occasions, to report Vandel's inappropriate sexual behavior toward Jane Doe II.

83.   Teacher 2 then pulled Jane Doe II out of class to talk with her about the reports regarding Vandel's inappropriate sexual conduct toward her. Jane Doe II told Teacher 2 that Vandel touched her in class, let his hand linger on her shoulder, complimented her "beautiful eyes," and made her feel uncomfortable. She also told Teacher 2 that Vandel messaged other minor female students late at night. Teacher 2 told Jane Doe II that Vandel made her feel uncomfortable as well and that he had messaged her late at night.

84.   Teacher 2 reported the substance of these discussions about Vandel to Defendant Beiner.

85.   At the same time, Teacher 2 also reported her own sexual harassment by Vandel, which occurred when she was bending over a copier to fix it and Vandel told her, in front of several students, that if she kept "bending over like that

he was going to have to do something about it." Teacher 2, who had been warned about Vandel by other FAST teachers, felt considerably embarrassed by his sexually harassing comment.

86.    In December 2019, after learning of Vandel's sexual assault on Jane Doe II and the additional reports by Teacher 2, Defendant Beiner and Vice Principal Epstein interrogated Jane Doe II alone in a school office.

87.    Despite not knowing Defendant Beiner and Vice Principal Epstein very well, Jane Doe II began to share with them that Vandel squeezed her shoulders and pulled her hair.

88.    Without allowing Jane Doe II to fully share her concerns, Defendant Beiner and Vice Principal Epstein immediately silenced Jane Doe II and told her that Vandel would be "mortified" to hear of how she "perceived" his behavior.

89.    Defendant Beiner also chastised, blamed, and demeaned Jane Doe II for wearing uniform pants that he described as "too tight."

90.    These blame-shifting remarks stopped Jane Doe II from sharing any further information regarding Vandel's grooming and sexually inappropriate behavior.

91.    Defendant Beiner and Vice Principal Epstein each knew exactly what effect these remarks would have on Jane Doe II. They knew that their remarks and

dismissiveness would discourage Jane Doe II from making any further report.

92.   Defendant Beiner and Vice Principal Epstein did not plan to do anything in reaction to the concerning the information they learned from Jane Doe II.

93.   Neither Defendant Beiner nor Vice Principal Epstein contacted Jane Doe II's parents to tell them their child was being sexually harassed by a teacher on a regular basis.

94.    Neither Defendant Beiner nor Vice Principal Epstein, or anyone else at FAST, provided social services to Jane Doe II, who was a victim of sexual assault at the hands of Vandel, their employee.

95.   The prior comments and actions of Principal Stinger and Board Member Erickson, which were designed to preclude and thwart efforts to report Vandel's conduct and thereby protect FAST and Vandel, resulted in and evidenced a deliberate intent to harm Jane Doe II by continuing to expose her to Vandel's sexual harassment, assault, and battery.

96.   In keeping with their practice of hiding and dismissing the allegations of sexual misconduct against Vandel, Defendant Beiner, Vice Principal Epstein, and other FAST administrators failed to notify or report Vandel's conduct to the Division of Family and Children Services of the Department of Human Services or

an appropriate police authority, district attorney, or child welfare agency.

97.   Defendant Beiner and Vice Principal Epstein were, at all relevant times, "mandatory reporters" under Georgia law. Despite their lawful duty to report, neither did anything to protect Jane Doe II or the other children under their care.

98.   Following these traumatic experiences, and with much trepidation and anxiety, Jane Doe II was forced to continue attending Vandel's class through the end of the semester in order to receive credit for certain high school level courses she was taking. However, as a result of the FAST administrators' deliberate indifference and shocking non-action, Jane Doe and John Doe felt their only recourse to protect Jane Doe II from FAST's abusive environment was to withdraw her from the school mid-year and enroll her in a private school, which they did upon her completion of the semester in December 2019.

99.   The FAST administration did nothing to intervene in that the FAST administration met reports of teacher misconduct with disbelief and ridicule.

100. FAST hated any bad press brought on by teacher conduct and avoided creating written records concerning such misconduct, which produced a breeding ground for bad things to happen.

101. Teacher 3, a teacher at FAST during the 2017-2018 and 2018-2019

school years, also reported Vandel for similar behavior:

  a.  Teacher 3 made at least four (4) separate reports to the FAST administration about her concerns regarding Vandel from 2017-2019. Two (2) of Teacher 3's reports regarded "sexual misconduct."

  b.  One report involved a minor female, sixth-grade student (Student 1), who sought out Teacher 3 and told her that Vandel messed with her hair and would walk behind her in class and touch and rub her shoulders and neck. The minor female student asked Vandel more than once to stop, but he did not stop. Student 1 also reported to Teacher 3 that Vandel leaned in too close when he talked to her. Teacher 3 reported all of this to Defendant Stinger, but she refused to believe Teacher 3, said Student 1 would have told her those things if they really happened, and did not perform an investigation.

  c.  Another report involved a young female teacher (Teacher 4), who told Teacher 3 that Vandel said and texted inappropriate things to her and that she asked him to stop, but that Vandel responded by telling her in the hallway: "I know you won't tell anyone about us, sweetie." Teacher 4 was worried that she would get in trouble at FAST for reporting Vandel's conduct. Teacher 3 reported all of this to the FAST administration, but they told her they would not and could not do anything about it.

102. Teacher 3 also reported Vandel for animal abuse on two occasions.

*After Jane Doe II withdraws from FAST,*
*Vandel rapes one of her former classmates*

103. Jane Doe II's parents withdrew her from FAST at the end of 2019.

104. Vandel then turned his attention to minor female Student 2, who was a friend and neighbor of Jane Doe II, and began grooming her in the same manner that he groomed Jane Doe II. Initially, Vandel began rubbing Student 2's shoulders like he rubbed Jane Doe II's shoulders, moving his hands downward to touch her breasts, every day in class.

105. Just a few short months later, in the early months of 2020, Vandel isolated Student 2 in his classroom and imprisoned, sexually assaulted, sexually battered, and forcibly raped Student 2 by inserting his penis in her vagina, causing her to bleed. Student 2 squirmed, resisted, and told Vandel to stop. After completing the rape, Vandel took a towel from his desk and used it to clean the blood off of Student 2 and himself before placing the towel back into the desk. Throughout the rape, Vandel told Student 2 that she was a "good girl." After cleaning up, Vandel gave Student 2 some ice cream and told her that he would not tell anyone what Student 2 had done.

106. Vandel ultimately pleaded guilty to the sexual molestation of Jane Doe II. Vandel was criminally convicted of this crime.

107. Vandel admitted to and pleaded guilty to the sexual assault, rape, and imprisonment of Student 2. Vandel was criminally convicted of these crimes.

108. On September 3, 2021, Defendant (Principal) Beiner communicated to all parents of FAST that Vandel had been arrested. Despite the multiple reports of Vandel's inappropriate sexual conduct toward minor female students, including Jane Doe II, and teachers at FAST over many years, Defendant (Principal) Beiner implied in his message that such reports, including Student 2's, may not have been true ("We must remember there is a child to be protected and a man's life that's balancing on the truth being told.").

*Damages*

109. Defendants subjected Jane Doe II to sexual harassment and assault that barred her from accessing an educational opportunity and benefit. Jane Doe II lost all confidence in her safety at FAST. Not only was she sexually assaulted by the male authority figure in charge of teaching and protecting her, but Jane Doe II was also subjected to constant bullying from other FAST students as a result of Vandel's grooming behavior and Defendants' non-action.

110. Jane Doe II was also subjected to an improper interview by two male administrators and was blamed by them for reporting Vandel's actions and made to feel at fault for the way she was dressed.

111. Jane Doe II was further traumatized by learning that, after she withdrew from FAST, Vandel subsequently turned his attention to her friend, Student 2, and employed the same grooming techniques that eventually led to a horrific rape. Jane Doe II shared with Student 2 the details of her experience with Vandel.

112. Jane Doe II now requires counseling and social services, which Defendants also neglected to provide, despite repeated requests from her parents.

113. Defendants created an intimidating, hostile, and offensive educational environment that seriously affected the psychological well-being of Jane Doe II.

114. As a direct and proximate result of the Defendants' wrongful conduct, Jane Doe II suffered serious injuries including physical injuries, extreme indignities and humiliation, severe emotional distress, mental anguish, loss of liberty, and a violation of that what she considers most sacred and personal.

115. Jane Doe and John Doe have incurred and will continue to incur medical expenses and consequential damages on behalf of Jane Doe II in connection with the violations she has suffered as a direct and proximate result of the Defendants' wrongful conduct.

116. Defendants are responsible for the injuries Jane Doe II has suffered and will suffer in the future as a result of the incidents at issue, as well as the medical

expenses and other consequential damages that will be incurred in the future as a result of Jane Doe II's injuries and Defendants' wrongful conduct.

117. The damages suffered by Jane Doe II were proximately caused by Defendants FAST, Higgins, and Beiner.

## CAUSES OF ACTION

### Count I
*Violation of Title IX*
*Against Defendant FAST*

118. Plaintiffs incorporate the factual allegations set forth above in paragraphs 1–117 as if fully set forth herein.

119. FAST received, at all relevant times, federal funds to ensure that all students have equal educational opportunities and access to education.

120. FAST's principals had the authority and ability to remedy the discrimination faced by Jane Doe II by firing Vandel, reassigning Vandel, enforcing existing teacher rules against Vandel, moving Jane Doe II to a different teacher, or taking other steps that would have ameliorated the discrimination faced by Jane Doe II.

121. Defendant Beiner knew that Jane Doe II was being sexually harassed by her teacher.

122. FAST principals Stinger, Mahoney, and Defendant Beiner also knew of

the past allegations against Vandel and his prior disciplinary record.

123. FAST principals Stinger, Mahoney, and Defendant Beiner also knew that multiple teachers reported ongoing harassment of young female students to each of them.

124. Members of FAST's educational board also knew of Vandel's past and ongoing sexual harassment of young female students.

125. Vandel's pervasive sexual harassment, physical abuse, and inappropriate touching of Jane Doe II denied her equal access to education.

126. FAST's reaction to the sexual harassment of Jane Doe II by Vandel was to deny that it occurred, to shame Jane Doe II, and to tolerate ongoing sexual harassment by Vandel.

127. As a direct result of the deliberate indifference of FAST, Jane Doe II has been excluded from participation in, and has been denied the benefit of, her education due to her sex.

128. FAST is liable to Plaintiffs under the implied right of action to enforce Title IX for damages in such amount as will compensate Jane Doe II for the educational opportunities and benefits she has lost and will lose; the physical and mental injuries Jane Doe II has suffered and will suffer; and the medical and rehabilitation expenses for Jane Doe II's care.

<u>Count II</u>
*Violation of the Fourteenth Amendment's Equal Protection Clause*
*under 42 U.S.C. § 1983*
*Against Defendants FAST, Higgins, and Beiner*

129. Plaintiffs incorporate the factual allegations set forth above in paragraphs 1–117 as if fully set forth herein.

130. Each Defendant acted under the color of law.

131. Gender and sex are protected classes under the equal protection clause.

132. Defendant Beiner's failure and refusal to act to intervene in the ongoing harassment of Jane Doe II was based upon Jane Doe II's sex and gender as well as her male teacher's sex and gender.

133. FAST would have intervened to stop the harassment and discipline Vandel if a male student was subjected to the same harassment as Jane Doe II.

134. Defendant Beiner and Higgins treated reports of sexual harassment and sexual violence against female students differently than they treated other reports of violence at the school.

135. FAST's principals and governing board were final decision makers and policy makers regarding the employment of Vandel. FAST's principals and governing board were the final decision makers on policies regarding: (1) the selection, retention, transfer, promotion, termination, and disciplining of faculty and staff; (2) how to investigate, respond to, and manage reports of sexual

harassment and assault against students by employees, including teachers; (3) reporting to parents the dangers posed by employees of FAST between the start of the 2017-18 school year and the sexual harassment and assault of Minor Jane Doe II; and (4) providing social services to minor students impacted and injured through sexual harassment and assault by a teacher.

136. FAST's final policy makers each participated in the decision making concerning the discipline and investigation of Vandel during his time as a FAST employee.

137. As set forth above, FAST had an established custom and practice of ignoring complaints and warnings of violence and sexual harassment of its young female students.

138. Defendant Beiner and Higgins treated reports of sexual harassment and sexual violence against female students differently than they treated other reports.

139. Defendants Beiner and Higgins acted in accordance with FAST's practice of silencing anyone who reported conditions concerning sexual harassment.

140.   Upon information and belief, FAST, Beiner, and Higgins would have conducted investigations in a manner that involved a more thorough inquiry and less shaming of the victim, filed reports, and terminated employees accused of

grooming, sexual harassment, and sexual assault of male students.

141. Defendants' actions in treating reports about female students being groomed, sexually harassed, and sexually assaulted differently is a violation of Equal Protection.

142. As the direct and proximate cause of Defendants' violation of Equal Protection, Minor Jane Doe II suffered physical, emotional, and psychological injury.

143. Plaintiffs are entitled to recover from Defendants all compensatory, special, economic, consequential, general, and all other damages permissible under federal law.

Count III
*Violation of the Fourteenth Amendment's Due Process Clause
under 42 U.S.C. § 1983
Against Defendants FAST and Beiner*

144.  Plaintiffs incorporate the factual allegations set forth above in paragraphs 1–117 as if fully set forth herein.

145. Plaintiffs bring this action under 42 U.S.C. § 1983, which allows for claims against defendants acting under the color of law for the deprivation of rights that are afforded under the Constitution, specifically for the deprivation of the substantive due process rights to Minor Jane Doe II, which are provided by the 14th Amendment.

146.  At all relevant times, Defendants acted under color of state law in their administration of and obligation to monitor and protect students at FAST.

147. Under the Fourteenth Amendment of the Constitution, Minor Jane Doe II had a constitutional right to liberty and bodily security, which Defendants violated through the adoption of unofficial customs and policies and through decisions made by the final decision makers that led to Minor Jane Doe II being sexually harassed and assaulted while in the care and supervision of Defendants.

148. Defendant Beiner's conduct shocks the conscience because he was aware that Vandel presented an ongoing threat to Jane Doe II and he did nothing to intervene in spite of knowledge of an ongoing substantial risk to her physical and mental well being.

149. Minor Jane Doe II had a constitutional right to liberty and bodily security, which was violated by being sexually harassed and assaulted while in the care of Defendants and the staff and employees at FAST.

Count IV
*Negligent Hiring, Supervision, and Retention*
*Against Defendants FAST, Higgins, and Beiner*

150. Plaintiffs incorporate the factual allegations set forth above in paragraphs 1–117 as if fully set forth herein.

151. FAST is a private corporation and is not protected by sovereign

immunity.

152. In the alternative, pursuant to the Hidden Predator Act, O.C.G.A. § 9-3-33.1, the State has waived sovereign immunity for childhood sexual abuse cases brought against government entities and employees.

153. Under Georgia law, FAST is liable for Vandel's assault, battery, intentional infliction of emotional distress, and other tortious conduct against Jane Doe II.

154. FAST, through its principals, teachers, administrators, and board members had notice of Vandel's propensity to sexually harass young female students.

155. FAST, through its principals, teachers, administrators, and board members had notice of Vandel's propensity to sexually harass Jane Doe II.

156. FAST took no corrective action in spite of this knowledge.

157. FAST's failure to take any corrective action was the proximate cause of Jane Doe II's physical and mental injuries.

158. Vandel's actions were reasonably foreseeable based on the knowledge possessed by FAST and its teachers, principals, and board members.

<u>Count V</u>
*Vicarious Liability for Vandel's Assault, Battery*
*Against Defendant FAST*

159. Plaintiffs incorporate the factual allegations set forth above in paragraphs 1–117 as if fully set forth herein.

160. FAST, through its principals and board members, knew that Vandel had the propensity for sexual harassment and sexual violence.

161. The only reason Vandel was able to harass Jane Doe II and commit assault and battery upon her was because his position as a FAST teacher enabled it.

162. Vandel was further enabled by FAST's failure to react to any of the reports received about his misconduct.

163. The reports received by FAST and Vandel's existing disciplinary and criminal history demonstrated a clear propensity for assaulting, sexually assaulting, and sexually harassing young female students.

164. Without FAST's acquiescence in Vandel's actions, Vandel would not have been in a position to commit assault and battery upon Jane Doe II by smacking her buttocks with a ruler, inflicting pain by grabbing and squeezing her shoulders, and pulling her hair.

Count VI
*Attorney's Fees under O.C.G.A. § 13-6-11*
*Against Defendants FAST, Higgins, and Beiner*

165. Plaintiffs incorporate the factual allegations set forth above in paragraphs 1–117 as if fully set forth herein.

166. Plaintiffs are entitled to recover expenses personally of litigation under O.C.G.A. § 13-6-11 because Defendants have acted in bad faith, been stubbornly litigious, and/or caused Plaintiffs unnecessary trouble and expense.

## REQUEST FOR RELIEF

Plaintiff respectfully requests this Court:

a. Assume jurisdiction over this matter;

b. Provide for a jury trial upon all claims and issues so triable;

c. Award Plaintiff nominal, compensatory, special, and punitive damages against all Defendants;

d. Award Plaintiff the costs of this litigation;

e. Award Plaintiffs attorney's fees pursuant to O.C.G.A. § 13-6-11;

f. Award Plaintiff attorney's fees and costs of litigation pursuant to 42 U.S.C. § 1988; and

g. Order all other relief to which Plaintiff is legally entitled either at law or in equity.

Submitted this 12th day of September, 2023.

**MOORE HALL, LLC**

*/s/ Michael J. Moore*
MICHAEL J. MOORE
Georgia Bar No. 520109
AIMEE J. HALL

Georgia Bar No. 318048
3630 Peachtree Road NE, Suite 1025
Atlanta, Georgia 30326
(404) 882-2960
mjmoore@moorehall.com
ajhall@moorehall.com

*Attorneys for Plaintiffs*

# EXHIBIT 1

**CHARTER FOR FULTON ACADEMY OF SCIENCE AND TECHNOLOGY**

This Charter for Fulton Academy of Science and Technology ("Charter") is entered into by and between Founding Fourteen, Inc.  ("Petitioner"), the Fulton County Board of Education ("Local Board") and the State Board of Education ("State Board") (collectively referred to as "the parties").

**WHEREAS,** the Petitioner submitted a petition to the Local Board proposing to establish a start-up charter school pursuant to O.C.G.A. § 20-2-2060 *et seq.*, the Charter Schools Act of 1998 ("Charter Schools Act"), and the Local Board approved the petition;

**WHEREAS,** the State Board finds that the petition complies with the provisions of the Charter Schools Act and the rules, regulations, policies, and procedures promulgated in accordance with O.C.G.A. § 20-2-2063 and further finds that the petition is in the public interest; and

**WHEREAS,** pursuant to O.C.G.A. § 20-2-2064.1, the State Board grants this Charter to permit Petitioner to operate Fulton Academy of Science and Technology ("the Charter School") in accordance with the terms and conditions of this Charter.

**NOW THEREFORE,** in consideration of the promises, mutual agreements, and covenants contained herein and other good and valuable consideration, the sufficiency of which is hereby acknowledged, the parties agree as follows:

1. **Definitions.** The terms below will be interpreted in accordance with the following definitions, unless and until federal or state law, or State Board of Education rules or regulations, or the state accountability system, is amended otherwise.

    a. **College and Career Ready Performance Index ("CCRPI"):** A comprehensive school improvement, accountability, and communication platform for all educational stakeholders that will promote college and career readiness for all Georgia public school students.

    b. **Elementary and Secondary Education Act as Amended ("ESEA as Amended"):** The federal education statute, originally passed by the U.S. Congress in 1965, that defines the role of the federal government in public education and authorizes many of the major federal education programs, including Title I. This Act was reauthorized by Congress in 2015 as the Every Student Succeeds Act ("ESSA").

**CHARTER FOR FULTON ACADEMY OF SCIENCE AND TECHNOLOGY**

c. **Education Service Provider ("ESP"):** A for-profit or non-profit organization that contracts with new or existing charter schools to provide services including, but not limited, to curriculum design, professional development, student assessments, financial and operational management, facilities management, and human resources management. An ESP may include Education Management Organizations ("EMOs"), Charter Management Organizations ("CMOs"), Education Service Organizations ("ESOs"), and others.

d. **Georgia Department of Education ("GaDOE" or "Department"):** The Georgia Department of Education is the state agency charged with the fiscal and administrative management of certain aspects of K–12 public education, including the implementation of federal and state mandates. Such management is subject to supervision and oversight by the State Board of Education.

e. **Georgia Milestones Assessment System ("Georgia Milestones"):** The Georgia Milestones Assessment System is a state-required assessment system to measure student acquisition of the knowledge and skills set forth in the state standards. Georgia Milestones is a consistent testing program that will be administered across grades three through twelve in the content areas of Reading, English/Language Arts, Mathematics, Science, Social Studies, and Writing.

f. **Local Educational Agency ("LEA"):** A Local Educational Agency is the public authority legally constituted by the state as an administrative agency to provide control of and direction for kindergarten through Grade 12 public education institutions.

g. **Material term or provision:** A material term or provision is an important or substantial aspect in this Charter. A change to a material term or provision may alter the rights, obligations, interests, or relations of the parties.

h. **State Board of Education ("SBOE" or "State Board"):** The State Board of Education is the constitutional authority that defines education policy for public K–12 education agencies in Georgia.

2. **Charter Term.** This Charter is for Petitioner to operate the Charter School for a five-year term beginning on July 1, 2021 and expiring on June 30, 2026.

3. **Grade Range and Enrollment.** The Charter School shall serve grades K-8. The Charter School's total enrollment shall not exceed 720 students during the term of the Charter. If the

**CHARTER FOR FULTON ACADEMY OF SCIENCE AND TECHNOLOGY**

Charter School seeks to exceed the enrollment of 720 students, it must seek an amendment to this Charter, to be agreed upon by each of the parties to this Charter. Any adjustments exceeding the Charter School's annual enrollment projections outlined in the petition, up to the number of students identified in this section, must be formally approved by the Local Board, which agrees to fund any additions above the annual projections for which it approves for the remainder of this Charter.

4. **Mission Statement.** The mission of the Charter School is to provide an education based on design thinking and problem-solving with an emphasis on science, technology, engineering, and mathematics (STEM) to K-8 children in the Fulton County community. The Charter School's goal is to prepare children in a way that provides them a foundation to be creative innovators and problem solvers so they are prepared for success and leadership in our rapidly changing world. With the diverse demographics of our existing community serving as the background theme for academics, children will develop the foundations for learning and thinking that prepares them for success in post-secondary education and careers.

5. **Essential or Innovative Features.** The Charter School will offer the following essential or innovative features during the charter term:
   - Incorporating Design Thinking into all facets and subject areas;

   - Adding one class hour each week for a "Genius" hour;

   - Creating a capstone project for 8th grade students; and

   - Teaching Coding and Computer Science to all grades.

6. **Maximum Flexibility Allowed by Law.** In exchange for the Charter School's agreement to meet or exceed the performance-based goals and measurable objectives set forth in Section 8 below, the State Board shall grant the maximum flexibility allowed by law to the Charter School. Pursuant to O.C.G.A. § 20-2-2065(a), the Charter School shall be entitled to the maximum flexibility allowed by law from the provisions of Title 20 of the Official Code of Georgia Annotated and from any state or local rule, regulation, policy, or procedure established by the Local Board, the State Board, or the Department. Notwithstanding this maximum flexibility, the Charter School shall comply with the terms of this Charter, the Charter Schools Act, including the provisions set forth in Section 16 below, and any rules, regulations, policies, or procedures established by the State Board or the Department, consistent with the Charter Schools Act.

**CHARTER FOR FULTON ACADEMY OF SCIENCE AND TECHNOLOGY**

7.  **Accreditation.** If the Charter School serves grades 8-12, the Charter School shall maintain accreditation from an approved accrediting agency identified in O.C.G.A. §§ 20-3-519(6)(A)(i) or 20-3-519(6)(A)(ii).

8.  **Performance-based Goals and Measurable Objectives.** In exchange for the flexibility granted in Section 6 above, the Charter School agrees to meet or exceed the performance-based goals and measurable objectives that are designed to result in improvement of student achievement as set forth by the State Board and Local Board in **Appendix A,** which is incorporated in and attached to this Charter.

9.  **Assessment and Accountability.** Notwithstanding Sections 6 and 8 above, the Charter School is subject to all accountability and assessment requirements set forth within Title 20 of the Official Code of Georgia Annotated, including, but not limited to, the accountability provisions of O.C.G.A. §§ 20-14-30 through 41, and any corresponding rules and regulations. The Charter School is further subject to all federal accountability requirements under the Elementary and Secondary Education Act, subject to any amendment, waiver, or reauthorization thereof.

10. **Annual Report.** The Charter School shall submit an annual report by November 1 of each year to the Georgia Department of Education.  The annual report shall comply with all requirements set forth in O.C.G.A. § 20-2-2067.1(c), including, but not limited to, an indication of the Charter School's progress towards the goals and objectives stated in Section 8 above and all state-mandated assessment and accountability scores from the previous year, if available. The Charter School shall post the annual report on the school's website and make copies available to the community.

11. **Open Enrollment and Admissions.** The Charter School shall comply with the open enrollment and admissions provisions set forth in O.C.G.A. § 20-2-2066. Enrollment shall be open to any student in accordance with the following criteria:

    a.  **Attendance Zone.** The attendance zone for the Charter School shall be the Fulton County School District.

    b.  **Application.** To be eligible for enrollment at the Charter School, students residing in the attendance zone must submit a timely application to the Charter School in accordance with the deadline set by the Charter School. The Charter School may use applications only for the purpose of verifying the student's residence within the school's attendance zone and grade level and to obtain information to establish weights in an enrollment lottery, if applicable. The Charter School may not use

admissions criteria or applications that would not otherwise be used at a traditional public school, including, but not limited to, requests for letters of recommendation, essays, resumes, or information regarding a student's school or community activities, grades, test scores, attendance record, or disciplinary history. The Charter School may gather other relevant information from students after enrollment is determined.

c. **Annual Enrollment.** The Charter School must offer at least one annual enrollment opportunity for each grade level served for which space is available.

d. **Random Lottery.** If the number of timely applicants received by the Charter School exceeds the approved enrollment or capacity of a program, class, grade level, or building, the Charter School shall ensure that such applicants have an equal chance of being admitted through a random selection process in accordance with O.C.G.A. § 20-2-2066(a)(1)(A), except for educationally disadvantaged students who may be provided an increased chance of admission through a weighted lottery. The Charter School shall not conduct more than one lottery, per grade, per admissions cycle.

e. **Statutory Enrollment Priorities.** In accordance with O.C.G.A. § 20-2-2066(a)(1)(A), the Charter School shall give enrollment priority to the following categories of applicants and in the following priority:

   i. A sibling of a student enrolled in the Charter School; and
   ii. A student whose parent or guardian is a member of the Governing Board of the Charter School or is a full-time teacher, professional, or other employee at the Charter School.

f. **Weighted Lottery.** In accordance with O.C.G.A. § 20-2-2066(a)(1)(A), the Charter School may utilize a weighted lottery to provide an increased chance of admission to educationally disadvantaged students, as defined by State Board Rule.

12. **Withdrawal without Penalty.** The Charter School shall comply with the provisions of O.C.G.A. § 20-2-2066(d) for withdrawing students. The Charter School agrees that a student may withdraw without penalty from the Charter School at any time and enroll in another public school in the local school system in which such student resides.

13. **State and Federally Mandated Educational Services.**

a. **Students with Disabilities.** The Charter School shall comply with all federal special education laws and regulations, including Section 504 of the Rehabilitation Act of 1973, Title II of the Americans with Disabilities Act, and the Individuals with

Disabilities Education Act. Special education teachers must have a bachelor's degree and must either be certified in special education or hold a special education license in Georgia.

b. **English Language Learners.** The Charter School shall comply with all applicable federal and state laws and regulations relating to the provision of educational services to English Language Learners.

c. **Remediation.** The Charter School shall provide remediation in required cases pursuant to State Board of Education Rule 160-4-5-.01 and ESEA as amended, subject to any amendment, waiver, or reauthorization thereof.

14. **Governance Structure.**

a. **Governing Board.** The Charter School shall utilize an autonomous governing body in the form of a Governing Board, which shall operate in accordance with its bylaws and **Appendix B** (Locally Approved Charter School Partners Roles and Responsibilities Chart) of this Charter and which shall be responsible for complying with and carrying out the provisions of this Charter, including compliance with all applicable law. Appendix B is incorporated in and attached to this Charter.

b. **Function.** It shall be the function of the Governing Board to uphold the Charter School's mission and vision, to set policy for the Charter School, to work collaboratively with school officials to ensure the Charter School complies with the performance goals enumerated in Appendix A, to ensure effective organizational planning, and to ensure financial stability of the Charter School.

c. **Autonomy.** The Governing Board shall exercise substantive control over such areas as policy, personnel decisions, financial decisions, curriculum and instruction, resource allocation, school improvement goals, and school operations, which are listed by way of example and not by limitation.

d. **Annual Training.** The Governing Board shall receive initial training and annual training thereafter. Pursuant to O.C.G.A § 20-2-2072 and relevant State Board Rule 160-4-9.06, the training shall include, but not be limited to, best practices on school governance, the constitutional and statutory requirements relating to public records and meetings, and the requirements of applicable statutes and rules and regulations.

e. **Public Meetings.** The Governing Board and its meetings, including emergency meetings, are subject to and shall comply with the Open and Public Meetings Act, O.C.G.A. § 50-14-1 *et seq.,* and any subsequent amendment thereof. The Governing Board shall conduct regular meetings consistent with principles of transparency and avoidance of actual or apparent conflicts of interest in the governance of the Charter School.

f. **Public Records.** The Governing Board is subject to and shall comply with the Georgia Open Records Act, O.C.G.A. § 50-18-70 *et seq.*, and any subsequent amendment thereof. The Governing Board shall maintain its adopted policies, budgets, meeting agendas, and minutes, and shall make such documents available for public inspection. The Charter School shall make the minutes of all Governing Board meetings available on its website within ten (10) business days after Governing Board approval and for the duration of the Charter.

g. **Conflicts of Interest.** The Governing Board shall establish a formal policy to prevent and disclose conflicts of interest. Members of the Governing Board and all individuals employed at the Charter School shall abide by such conflicts of interest policy. Upon request, the Charter School shall provide conflict of interest forms to the Local Board or Department demonstrating that Governing Board members are in compliance with the conflicts of interest policy.

h. **Public Status.** Petitioner assures that the Charter School shall be a public, nonsectarian, nonreligious, nonprofit school organized and operated under the laws of the State of Georgia. Petitioner further assures that the Charter School shall not be home based.

i. **Board Compensation.** Petitioner shall not compensate members of the Charter School's Governing Board in excess of reasonable expenses incurred in connection with actual attendance at board meetings or with performance of duties associated therewith.

15. **Fiscal Control.**

a. **Financial Reporting Requirements.** The Charter School shall follow the financial requirements of the Charter Schools Section of the Department's Financial Management for Georgia Local Units of Administration Manual. The Charter School shall submit all information required by the State Accounting Office for inclusion in the State of Georgia Comprehensive Annual Financial Report.

**CHARTER FOR FULTON ACADEMY OF SCIENCE AND TECHNOLOGY**

  b. **Annual Audit.** The Charter School shall have an annual financial audit.

       i. The financial audit shall be conducted by an independent certified public accountant licensed in the State of Georgia. The Charter School will submit its annual financial audit to the State of Georgia by November 1st each year.

      ii. A separate audit shall not be required for a school if the Charter School is included in the local school system audit conducted pursuant to O.C.G.A. § 50-6-6, but the Charter School will submit the system's audit to the State of Georgia by November 1st each year.

  c. **Base Per-Pupil Funding.** The base per-pupil funding amount is the school system's good-faith estimate for the charter term. Based on this estimate, the Local Board shall fund the Charter School at no less than a per-pupil base rate of $8,719.00, provided that the amount of revenue received by the local district is equal to the amount of state and local revenue upon which the approved school budget is based.

  d. **Chief Financial Officer.** The Charter School shall designate a Chief Financial Officer, who shall possess the following minimum qualifications:

       i. A baccalaureate or higher degree in business, accounting, or finance from an accredited college or university and a minimum of four (4) years' experience in a field related to business or finance; or

      ii. Documented experience of ten (10) or more years in the field of business and financial management.

  e. **Federal Funding and Monitoring Requirements.** The Charter School shall comply with all federal eligibility and monitoring requirements related to the application for and receipt of federal funds.

  f. **Insurance.** The Charter School shall obtain adequate insurance coverage and shall maintain such coverage throughout the Charter term in accordance with the laws of the State of Georgia. The Charter School shall obtain a Certificate of Insurance which shall name the Local Board and the State Board as additional insureds.

  g. **Surplus Funds.** Any surplus funds remaining at the close of each fiscal year will be used to enhance the Charter School's academic program. Under no circumstances shall

**CHARTER FOR FULTON ACADEMY OF SCIENCE AND TECHNOLOGY**

any surplus be distributed to the Charter School's employee(s), Governing Board member(s), educational service provider, or educational management organization. Nothing in this section shall be construed to prevent the Charter School from setting aside surplus funds in a reserve account or budgeting and awarding performance bonuses as part of their annual operating expenses.

h.   **Responsibility for Debts.** The Charter School is solely responsible for all debts incurred by the Charter School and its Governing Board. Except as agreed hereto, the Local Board and the State Board shall not be contractually bound to the Charter School or to any third party with whom the Charter School has a contract or from whom the Charter School has purchased goods or services.

16. **Compliance with Other Laws, Rules, and Regulations.** The Charter School shall operate in accordance with the United States Constitution, the Constitution of the State of Georgia, and all applicable federal, state, and local laws that may not be waived pursuant to O.C.G.A. § 20-2-2065, including, but not limited to:

a.   **Civil Rights, Insurance, Health, Safety, and Conflicting Interests.** The Charter School shall operate in accordance with all applicable federal, state, and local rules, regulations, court orders, and statutes relating to civil rights; insurance; the protection of the physical health and safety of students, employees, and visitors; conflicting interest transactions; and the prevention of unlawful conduct.

b.   **Asbestos Remediation.** The Charter School shall comply with the terms of any applicable asbestos remediation plan.

c.   **Unlawful Conduct.** The Charter School shall be subject to all laws relating to unlawful conduct in or near a public school.

d.   **Student Conduct and Discipline.** The Charter School shall maintain and implement a written policy regarding student discipline, which policy shall be consistent with due process.

e.   **State Board of Education Rules.** The Charter School shall operate in accordance with all State Board of Education Rules promulgated in accordance with the Administrative Procedure Act during the term herein that are not subject to any waiver granted in Section 6 above.

CHARTER FOR FULTON ACADEMY OF SCIENCE AND TECHNOLOGY

f.  **Prohibition on Discrimination.** The Charter School shall not discriminate against students on the basis of disability, race, creed, color, gender, national origin, religion, ancestry, marital status, academic ability, the need for special educational services, or any other characteristic protected by local, state, or federal law.

g.  **Reporting Requirements.** The Charter School shall be subject to all reporting requirements of O.C.G.A. §§ 20-2-160, 20-2-161(e), 20-2-320, and 20-2-740.

h.  **Tuition.** The Charter School shall not charge tuition or fees to its students except as may be authorized for local boards pursuant to O.C.G.A. § 20-2-133.

i.  **Brief Period of Quiet Reflection.** The Charter School shall comply with O.C.G.A. § 20-2-1050, which requires a brief period of quiet reflection.

j.  **Individual Graduation Plans.** The Charter school shall comply with O.C.G.A. § 20-2-327 related to Individual Graduation Plans.

k.  **Family Educational Rights and Privacy Act.** The Charter School is subject to all provisions of the Federal Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g. In the event the Charter School closes, it shall transmit all official student records in the manner prescribed by the State Board or the Georgia Department of Education.

l.  **Records Retention.**  The Charter School shall be responsible for maintaining and retaining its records, including student records, employee records, and all corporate records related to the Charter School's operations in accordance with Georgia Law, State Board Rule, and this Charter.  In the event that the Charter School closes, it shall provide for the maintenance, retrieval, and transmittal of all records in the manner prescribed by the State Board or the Department.  Neither the Department nor the State Board shall be required to assume possession of the Charter School records.

m.  **QBE Formula Earnings.** The Charter School acknowledges that criteria used to calculate Quality Basic Education ("QBE") funding may not be waived.

17. **Education Service Providers.**

a.  If the Charter School does not contract with an Education Service Provider at the time of execution of this Charter but later elects to contract with an Education Service

Provider, such decision will require a charter amendment prior to execution of an agreement with an Education Service Provider.

b. If the Charter School contracts with an Education Service Provider, the Charter School shall notify the Local Board and the State Board before agreeing to any material changes or amendments to the contract with the Education Service Provider. The Charter School shall provide notice to the Local Board and State Board at least thirty (30) days prior to signing the revised contract. The notice shall include a copy of the proposed changes and/or amendments to the contract between the Charter School and the Education Service Provider. If any changes to the contract between the Charter School and Education Service Provider result in material changes to this Charter, the Charter School shall seek an amendment to this Charter.

18. **Compliance with the Rules, Practices, Policies, and Procedures of the Department.** The Charter School shall operate in accordance with the rules, practices, policies, and procedures established by the State Board and the Department.

19. **Employment Matters.** Individuals employed at the Charter School shall not be considered employees of the State Board or the Department.

   a. **Background Checks.** The Charter School shall continue to utilize background check procedures and shall ensure that all prospective employees or any individual that will have substantial contact with students undergo a fingerprinting and background check prior to beginning work at the Charter School or having contact with students.

   b. **Teachers' Retirement System.** All qualified teachers at the Charter School shall be members of the Teachers Retirement System of Georgia ("TRS") and subject to its requirements. The Charter School is responsible for making arrangements with TRS and making monthly contributions for its teachers in accordance with state requirements.

   c. **Teacher and Leader Evaluation.** The Charter School shall continue to implement the Teacher Keys Effectiveness System ("TKES") and Leader Keys effectiveness System ("LKES") in accordance with O.C.G.A. §20-2-210(b)(1) and State Board Rule 160-5-1-.37. The Charter School shall have at least two individuals credentialed in using TKES. If the most senior Charter School leader must be evaluated using LKES because he or she performs the duties of a principal as defined by State Board Rule 160-5-1-.37, a member of the Governing Board, who is credentialed in using LKES, shall serve as his or her evaluator.

**CHARTER FOR FULTON ACADEMY OF SCIENCE AND TECHNOLOGY**

20. **Record Inspection.** Subject to state and federal laws, the Local Board, the State Board, the Department and their agents, and the State Auditor's office shall have the right to examine and copy all records, reports, documents, and files relating to any activity, program, or student of the Charter School.

21. **Facilities.**

   a. **Approval of Site and/or Facility.** The Charter School shall maintain proper approval for all sites and/or facilities and obtain proper approval for all new sites and/or facilities, prior to commencing any new construction, and prior to student occupation of any new facilities. The Charter School shall contact the Georgia Department of Education's Facilities Services Division regarding the following:

   i. **Site Approval.** The Charter School shall maintain site approval by the Facilities Services Division and obtain site approval for any new sites through the Facilities Services Division's process. Once a new site approval has been granted, the Charter School will be issued an additional site code. The Charter School shall not commit to any certificate of lease or ownership, commence any construction, nor allow student occupation prior to site approval of any new sites and/or facilities.

   ii. **Architectural Review.** The Charter School shall submit to and receive approval from the Facilities Services Division of all architectural plans for any new facility that will house any part of the Charter School during the Charter term. The Charter School shall not commit to any certificate of lease or ownership, commence any construction, nor allow student occupation prior to architectural review of the new facility.

   iii. **School Code Approval.** After securing both site approval and architectural review approval a new school code shall be obtained for the new site and/or facility. A locally approved Charter School shall contact their school system's facilities department and make a request for a school code. The Charter School shall properly obtain a school code prior to occupancy of the new site and/or facility.

   b. Prior to opening any new Charter School site and/or facility, and prior to students occupying any new facility, the Charter School shall obtain and submit the following documents to the Department:

    i. **Documentation of Ownership or Lease Agreement.** The Charter School shall obtain documentation of ownership or the lease agreement for the new facility that will house all or part of the Charter School.

    ii. **Certificate of Occupancy.** The Charter School shall obtain a Certificate of Occupancy for the facility in which all or part of Charter School shall be located.

    iii. **Emergency Safety Plan.** The Charter School shall prepare a safety plan in accordance with O.C.G.A. § 20-2-1185. This plan shall be submitted to the local emergency management agency and local law enforcement agency for approval.

22. **Transportation.** To the extent the Charter School offers a transportation program for its students, the Charter School shall ensure that the program complies with all applicable laws governing transportation of students.

23. **Food Services.** To the extent the Charter School offers a food service program, the Charter School shall ensure that the program complies with all applicable laws governing food service for students.

24. **Termination of Charter.**

    a. **Termination Grounds.** The Charter School may be terminated based on any of the following grounds:

        i. The Charter School's failure to timely implement the interventions set forth or approved by the Department;

        ii. The Charter School's failure to adhere to any material term of this Charter, including but not limited to, failure to achieve the performance goals set forth in Section 8 above and **Appendix A**;

        iii. The Charter School's failure to comply with any recommendation or direction of the State Board with respect to O.C.G.A. § 20-14-41;

iv.    The Charter School's failure to meet generally accepted standards of fiscal management;

v.    The Charter School's violation of applicable federal, state, local laws, court orders, or federal or state rules or regulations;

vi.    The existence of competent substantial evidence that the continued operation of the Charter School would be contrary to the best interests of the students or the community;

vii.    The Charter School's failure to comply with any provision of the Charter Schools Act;

viii.    The existence of conditions that place the health, safety, or welfare of students or staff of the Charter School in danger; or

ix.    The Charter School's failure to disclose material information regarding violations or potential violations of any material term of this Charter or applicable federal, state, or local laws, court orders, or federal or state rules or regulations;

x.    The Local Board's failure to meet the principles and standards of charter school authorizing on the Local Board's annual evaluation for two consecutive years as required by O.C.G.A. § 20-2-2063.3 and the accompanying State Board Rule(s).

b.    **Requests for Termination.**  The termination of this Charter may be requested by a majority of the parents or guardians of the students enrolled in the Charter School, a majority of the faculty and instructional staff employed at the Charter School, the Local Board, or the State Board following the procedures identified in O.C.G.A. § 20-2-2068 and the accompanying State Board Rule(s).

c.    **Breach of Charter.**  In the event the Charter School fails to comply with any material provision of this Charter, the Department shall notify the Charter School by (1) certified mail, postage prepaid, return receipt requested, (2) a nationally recognized overnight courier, or (3) electronic mail with a confirmation copy sent by first class mail to the chairperson of the Governing Board.  The nature and outcome of the breach shall be recorded in a memo and placed in the Charter School's file maintained by the Department.

**CHARTER FOR FULTON ACADEMY OF SCIENCE AND TECHNOLOGY**

d.  **Termination Procedures.** The parties acknowledge and agree the procedure for terminating this Charter will follow the procedures outlined in State Board Rule 160-4-9-.06(4)(e).

e.  **Distribution of Funds and Assets.** In the event the Charter School ceases operation for any reason, the Charter School and its Governing Board will be responsible for concluding the business and affairs of the Charter School and will cooperate with the Local Board and State Board to the extent necessary to provide an orderly return of the students to their local school. Any public surplus remaining at the time the Charter School ceases operation shall be remitted to the Local Board or State Board, whichever is appropriate, within 30 days of ceasing operations. Any furniture and equipment purchased with public funds shall be delivered to the Local Board or State Board, whichever is appropriate, within 30 days of ceasing operations. Neither the Local Board nor the State Board shall be responsible for the Charter School's unpaid debts in the event the Charter School does not have sufficient funds to pay all of its debts at the time it ceases operation. The date by which public surplus funds, furniture, and equipment shall be remitted to the Local Board or State Board under this Section may be extended for a reasonable period of time as determined by the Local Board or State Board; provided that, within thirty (30) days of the Charter School ceasing operations, the Governing Board makes a written request for an extension of time that describes the basis for the request.

25. **Pre-Opening Suspension.** In the event the Charter School fails to comply with any material provision set forth in this Charter that requires compliance prior to the opening of any new site and/or facility for the Charter School, the opening may be suspended until a time after all requirements have been fulfilled by the Charter School as determined by the Local Board and Department. Suspension will prohibit the extension of the Charter term set forth above in Section 2.

26. **Renewal, Non-Renewal, and Probationary Term.**

a.  **Renewal.** The Charter may be renewed by agreement of the parties following the procedures set forth in the Charter Schools Act and accompanying State Board Rule(s).

b.  **Non-Renewal.** Any grounds for termination stated in Section 24(a) above also may be grounds for non-renewal. In addition, the State Board or Local Board may elect

**CHARTER FOR FULTON ACADEMY OF SCIENCE AND TECHNOLOGY**

not to renew the Charter if the petition for renewal does not comply with the Charter Schools Act and the rules, regulations, policies, and procedures promulgated in accordance with the Charter Schools Act or if the State Board or Local Board deems that the Charter School is no longer in the public interest.

c. **Probationary Term.** In the event the Charter School fails to comply with any provision of this Charter, the Local Board may elect to grant a renewal for a probationary term, pending approval by the State Board of Education, within which term the Charter School must come into compliance satisfactory to the State Board and Local Board.

27. **Temporary Extension.** At the discretion of the Local Board and State Board, a Charter may be extended for a grace period not exceeding sixty (60) days. A temporary extension must be in writing and mutually agreed upon by the parties to this Charter.

28. **Amendments to the Charter.** Any term of this Charter may be amended in writing upon the approval of the Local Board, the State Board, and a majority of the Governing Board of the Charter School. Any proposed amendment shall be made in accordance with State Board Rule 160-4-9-.06 *et seq.*

29. **Mandatory Training.** The State Board reserves the right to require the Charter School to attend any training related to the responsibilities of a Charter School.

30. **Indemnification.**

a. The Petitioner and the Charter School agree to indemnify, defend and hold harmless the Local Board, the School District, the Department, and the State Board, their officials, officers, employees, agents, volunteers, and assigns (all of whom hereinafter may collectively be referred to as "Indemnitees"), from any and all claims, demands, suits, actions, legal or administrative proceedings, losses, liabilities, costs, interest, and damages of every kind and description, including any attorneys' fees and/or litigation and investigative expenses, for bodily injury, personal injury, (including, but not limited to, the Charter School's employees), patent, copyright, or infringement on any intellectual property rights, or loss or destruction of property (including loss of use, damage or destruction of Indemnitee owned property) to the extent that any such claim or suit was caused by, arose out of, or contributed to, in whole or in part, by reason of any act, omission, professional error, fault, mistake, or negligence whether active, passive or imputed, of the Charter School or Petitioner, their employees, agents,

**CHARTER FOR FULTON ACADEMY OF SCIENCE AND TECHNOLOGY**

representatives, or subcontractors, their employees, agents, or representatives in connection with or incidental to their performance of this Charter regardless of whether such liability, claim, damage, loss, cost or expense is caused in part by an Indemnitee.

b. The Charter School and Petitioner shall be excused from their indemnification obligations above: (a) If the claims, demands, suits, actions, proceedings, losses, liabilities arise solely and exclusively out of the negligence of the Indemnitee seeking indemnification; or (b) If the Indemnitee fails to (i) provide written notice of the third party claim or suit within a reasonable time, (ii) cooperate with reasonable requests of the Charter School or Petitioner related to the indemnification; or (iii) assist the Charter School or Petitioner with the defense of such claim or suit.

c. The Charter School's and Petitioner's obligations to indemnify any Indemnitee shall survive the completion, expiration, or termination of this Agreement for any reason.

31. **Non-Agency.** The parties expressly acknowledge and agree that the Charter School is not acting as the agent of the Local Board, the State Board, or the Department except as required by law or this Charter. The Charter School acknowledges that it is without authority to, and will not, extend the faith and credit of the Local Board, the State Board, or the Department to any third party.

32. **Delegation.** The parties acknowledge and agree that the functions and powers of each party may be exercised only by each party and may not be delegated to a third party without written agreement by the parties.

33. **Application of Amended Law.** This Charter is subject to applicable federal and state laws, rules, regulations, and state accountability requirements. Any amendments to laws, rules, regulations, or state accountability requirements cited herein will result in the correlative and immediate modification of this Agreement without the necessity for executing a written amendment.

34. **Headings.** Section headings are for convenient reference only and are not part of the Charter or in any way to enlarge or limit any Section's contents.

35. **Non-Waiver.** No waiver of any breach of this Charter shall be held as waiver of any other or subsequent breach.

**CHARTER FOR FULTON ACADEMY OF SCIENCE AND TECHNOLOGY**

36. **Severability.** If any provision of this Charter is determined to be unenforceable or invalid for any reason, the remainder of the Charter shall remain in full force and effect.

37. **Contradicting or Conflicting Provisions.** If any provision of the Charter is determined to contradict or conflict with any other provision of the Charter, the contradiction or conflict shall be resolved in favor of the broad flexibility guaranteed pursuant to O.C.G.A. § 20-2-2065 *et seq.*

38. **Governing Law and Venue.** This Charter shall be governed by, subject to, and construed under the laws of the State of Georgia. Any action brought by one party to this Charter against another party shall be brought in the Superior Court of Fulton County.

39. **Multi-Year Contracts Beyond Charter Term.** The Charter School shall not enter into a multi-year contract that extends beyond the length of the charter term for the acquisition of goods, materials, services, or supplies unless such contract contains the following provisions:

    a. The contract shall terminate absolutely and without further obligation on the part of the Charter School at the close of the fiscal year in which the charter term concludes and at the close of each succeeding charter term for which the contract may be renewed;

    b. The contract may be renewed only by a positive action taken by the Charter School; and

    c. The contract shall state the total payment obligation of the Charter School for the original contract term and each renewal shall state the total payment obligation that may be incurred in each subsequent charter term, if renewed.

    This section shall not apply to multi-year contracts to lease or purchase facilities, vehicles, or capital equipment.

40. **Entire Agreement.** This Charter sets forth the entire agreement among the Petitioner, the Local Board, and the State Board with respect to the subject matter of this Charter. All prior contracts, representations, statements, negotiations, understandings, and undertakings between the Petitioner, the Local Board, and the State Board are superseded by this Charter. The petition submitted to the Local Board and the State Board serves only as the formal application for the Charter School and does not constitute a contract between the Local Board, the State Board, and the Petitioner.

**CHARTER FOR FULTON ACADEMY OF SCIENCE AND TECHNOLOGY**

41. **Counterparts.** The Parties agree that this Agreement may be executed in one or more counterparts which, when taken together, shall constitute one Agreement. All faxed or scanned and emailed counterpart signature copies of this Agreement shall be as effective and binding as original signatures.


_____          _____
Chairperson,                                                    (Date)
GEORGIA STATE BOARD OF EDUCATION


_____          _____
Authorized Representative,                              (Date)
 FOUNDING FOURTEEN, INC.


_____          _____
Board President,                                             (Date)
FULTON COUNTY BOARD OF EDUCATION

## 5 Year Renewal Appendix A – Charter Accountability and Consequences

### ACCOUNTABILITY REQUIREMENTS

The Local Board and State Board shall hold the Charter School accountable for the full performance of the performance framework standards listed below. In the event that data are not available to make a determination regarding one of the goals below, the Department and the Local Board shall use the remaining goals to decide if the school has met its accountability requirements.

The Charter School will receive a report on its performance on each of the standards below from the Georgia Department of Education as they become available. The report will include any interventions or consequences that need to be implemented by the Charter School.

*Note: Accountability for the last year of the charter contract term will occur during the first year of a renewal charter, if granted.*

I. **ACADEMIC PERFORMANCE STANDARDS**

**Goal 1:** During each year of its charter contract term the Charter School shall meet at least one of the following performance standards.

**First Look – School Performance Gap Closure.** The primary academic outcome Georgia seeks from its local charter schools is that they ***increase their College and Career Readiness Performance Index (CCRPI) score each year until they reach 100.*** The performance standards that measure CCRPI progress include growth in CCRPI itself and in its two major academic components, Content Mastery and Progress Score. The Department's "First Look" at annual charter school performance is to see if the school has met the standard for any of the following three CCRPI gap-closing measures.

a. Increase its CCRPI score by at least 4% of the gap between 100 and the school's previous year CCRPI score in each grade band served (elementary, middle, and/or high school);

**OR**

b. Increase its CCRPI Content Mastery score by at least 10% of the gap between 100 and its previous year CCRPI Content Mastery score in each grade band served (elementary, middle, and/or high school);

**OR**

c. Increase its CCRPI Progress score by at least 10% of the gap between 100 and its previous year CCRPI Progress score in each grade band served (elementary, middle, and/or high school).

**Second Look – School-District Comparisons.** If a charter school does not achieve at least one of the "First Look" School Performance Gap Closure standards, consideration will be given for achieving one of the "Second Look" School-District Comparison standards. The secondary academic outcome Georgia seeks from its local charter schools is that **they *do better than the district schools to which their students would otherwise be zoned.*** Performance standards include whether the charter school exceeds the CCRPI score (CCRPI, Content Mastery, or Progress) of their authorizing district or of the average of the three district schools to which a majority of the charter school's students would otherwise be zoned ("majority comparison schools").

    a. Exceed the CCRPI score of the authorizing school district or of the district majority comparison schools;

       **OR**

    b. Exceed the CCRPI Content Mastery scores of the authorizing school district or the district majority comparison schools;

       **OR**

    c. Exceed the CCRPI Progress scores of the authorizing school district or of the district majority comparison schools.

**Goal 2:** During each year of its charter contract term, the school will perform at the level required to stay off the list of Targeted Support and Improvement (TSI) and Comprehensive Support and Improvement (CSI) schools published annually by GaDOE.

## II.   SCHOOL CLIMATE PERFORMANCE STANDARDS

**Goal 3:** The Charter School shall achieve and maintain a School Climate Star Rating of 4 or more stars during its Charter term.

## III.   FINANCIAL PERFORMANCE STANDARDS

**Goal 4:** During each year of its charter contract term, the Charter School shall achieve all six of the following financial performance standards.

    a. Not be in default of loan or bond covenant(s) and not be delinquent with debt services payment;

       **AND**

    b. Achieve a Liquidity Ratio that is greater than 0 and less than one as measured by (current assets less current liabilities) divided by total expenses;

**APPENDIX A – CHARTER FOR FULTON ACADEMY OF SCIENCE AND TECHNOLOGY (FAST)**

    **AND**

c. Achieve a Current Ratio (Working Capital Ratio) that is greater than 1.0 and one-year trend is positive;

    **AND**

d. Possess a Debt to Asset Ratio that is less than 95 percent;

    **AND**

e. Unrestricted Days Cash (Total Expenses/365) is greater than 45 days and the one-year trend is positive;

    **AND**

f. Achieve a sustainability ratio indicating at least a 45-day reserve as measured  by unrestricted assets divided by average monthly expenses;

    **AND**

g. The Charter School received and submitted to GaDOE by November 1 an annual independent audit with an opinion of the auditor regarding the accuracy of the Charter School's accounting records, financial position, change in financial position, compliance with rules of various governing entities, including GAGAS (Generally Accepted Government Auditing Standards, i.e. the "Yellow Book") or, for those schools not yet converted to GAGAS, compliance with GAAP (Generally Accepted Accounting Principles) that includes:
- An unmodified audit opinion;
- An audit devoid of significant findings and conditions, material weaknesses, or significant internal control weaknesses;
- An audit that does not include a going concern disclosure in the notes or an explanatory paragraph; and
- No other adverse statement indicating noncompliance with applicable laws, rules, regulations, and provisions of the charter contract relating to financial management and oversight.

## IV.   GOVERNANCE PERFORMANCE STANDARDS

**Goal 5:** During each year of its charter contract term, the Charter School shall achieve all six of the following governance performance standards.

a. All Governing Board members complied with all applicable open governance requirements, including the Georgia Open Meetings Act and the Georgia Open Records Act;

    **AND**

APPENDIX A – CHARTER FOR FULTON ACADEMY OF SCIENCE AND TECHNOLOGY (FAST)

    b.  All Governing Board members attended all required training, including all training required for any new Governing Board members;

        **AND**

    c.  The Board met a minimum of seven (7) times;

        **AND**

    d.  The Charter School's leadership and Governing Board successfully implemented the Teacher and Leader Keys Effectiveness System as verified by GaDOE;

        **AND**

    e.  All Governing Board members acted in accordance with the *Standards for Effective Governance of a Georgia Non-Profit School Governing Board*;

        **AND**

    f.  The Board reflects the sociodemographic diversity of the community it serves;

        **AND**

    g.  All governing board members have a current background check during each academic year of the charter contract.

**Goal 6:** By the last year of its charter contract term, the Charter School shall implement all Essential or Innovative Features as defined in Section 5 of the charter in all material respects.

## V.  LEGAL COMPLIANCE PERFORMANCE STANDARDS

**Goal 7:**  During each year of its charter contract term, the Charter School shall implement all legal requirements included in federal and state law, rules, and regulations and in its Charter.

**Goal 8:** The Charter School shall not do anything which results in GaDOE or the authorizing district(s) placing the Charter School on probation more than two times in a single school year (July 1 to June 30).

**Goal 9:** The Charter School shall not do anything which results in GaDOE or the authorizing district(s) placing it on probation more than three times during its charter contract term.

APPENDIX A – CHARTER FOR FULTON ACADEMY OF SCIENCE AND TECHNOLOGY (FAST)

**ACCOUNTABILITY MONITORING AND REVIEW**

The Local Board and State Board shall hold the Charter School accountable for the full performance of the goals outlined in this Charter.

The Local Board of Education is responsible for the annual monitoring and review of the Charter School for full performance of this Charter.

The Georgia Department of Education will monitor and review the Charter School for full performance of this Charter.

The State Board shall hold the Local Board of Education accountable for effective authorizing practices in support of this Charter.

The Georgia Department of Education will monitor and review the Local Board of Education for effective authorizing practices.

**CONSEQUENCES**

Failure to meet the goals outlined in this Charter may result in consequences up to and including intervention, probation, termination, or recommendation for nonrenewal.

**APPENDIX B – CHARTER FOR FULTON ACADEMY OF SCIENCE AND TECHNOLOGY (FAST)**

**Introduction:** Locally-approved charter school non-profit governing boards must have decision-making authority in all areas, including personnel decisions, financial decisions and resource allocation, curriculum and instruction, establishing and monitoring the achievement of school improvement goals, and school operations. The columns in the chart below describe the authority that must be exercised by a charter school's governing board, management, and school district respectively. There are also columns provided for other common charter school partners (if applicable).

## Locally-Approved Charter School Partners Roles and Responsibilities Chart- Fulton Academy of Science and Technology

| Personnel Decisions | Charter School Nonprofit Governing Board | Charter School Management | Local School District* | Post-Secondary Education Partner(s) (if applicable) | Business Partner(s) (if applicable) | Community Partner(s) (if applicable) |
|---|---|---|---|---|---|---|
| Select, retain, transfer, promote, demote, and/or terminate the principal or school leader | ✓ | | | | | |
| Evaluate the principal or school leader (LKES) | ✓ | | | | | |
| Select, retain, transfer, promote, demote, and/or terminate faculty and all other staff | | ✓ | | | | |
| Evaluate the teachers (TKES) and all other staff | | ✓ | | | | |
| Determine whether teacher certification will be required | ✓ | ✓ | | | | |
| Plan professional development for staff | | ✓ | | | | |
| **Financial Decisions and Resource Allocation** | **Charter School Nonprofit Governing Board** | **Charter School Management** | **Local School District*** | **Post-Secondary Education Partner(s) (if applicable)** | **Business Partner(s) (if applicable)** | **Community Partner(s) (if applicable)** |
| Determine number and type of personnel positions budgeted, including qualifications, roles, and job descriptions | ✓ | ✓ | | | | |
| Establish compensation model including salary ranges, bonus or performance-based increases, supplements, and personal and professional leave, health, dental, disability, and other benefit plans offered (other than TRS, which is mandated) for all employees | ✓ | ✓ | | | | |
| Set budget priorities with funds received that are aligned with school improvement plan, including personnel, curriculum, supply, equipment, maintenance, operations, and all other costs | ✓ | ✓ | | | | |
| Ensure school receives all per-pupil and other funding to which it is entitled by agreement with the local district (its fiscal agent) | ✓ | ✓ | ✓ | | | |
| Raise additional funds through fundraising efforts | ✓ | ✓ | | | | |

**APPENDIX B – CHARTER FOR FULTON ACADEMY OF SCIENCE AND TECHNOLOGY (FAST)**

## Locally-Approved Charter School Partners Roles and Responsibilities Chart- Fulton Academy of Science and Technology

| | Charter School Nonprofit Governing Board | Charter School Management | Local School District* | Post-Secondary Education Partner(s) (if applicable) | Business Partner(s) (if applicable) | Community Partner(s) (if applicable) |
|---|:---:|:---:|:---:|:---:|:---:|:---:|
| Exercise discretion over expenditure for all state and local funds and, as permissible, federal funds | | ✓ | | | | |
| Final school budget approval | ✓ | | | | | |
| Establish financial policies and standard operating procedures | ✓ | | | | | |
| Maintain a reserve fund | ✓ | | | | | |
| Determine facility uses | ✓ | ✓ | | | | |
| Ensure sound fiscal management and monitor budget implementation | ✓ | ✓ | | | | |

| **Curriculum and Instruction** | Charter School Nonprofit Governing Board | Charter School Management | Local School District* | Post-Secondary Education Partner(s) (if applicable) | Business Partner(s) (if applicable) | Community Partner(s) (if applicable) |
|---|:---:|:---:|:---:|:---:|:---:|:---:|
| Recommend/Adopt instructional delivery model | ✓ | ✓ | | | | |
| Recommend/Adopt curriculum, including any changes in curriculum as needed to improve student achievement | ✓ | ✓ | | | | |
| Recommend/Adopt courses and programs to offer | ✓ | ✓ | | | | |
| Recommend/Adopt textbooks, technology, and instructional materials | ✓ | ✓ | | | | |
| Recommend/Establish additional graduation requirements | ✓ | ✓ | | | | |
| Recommend/Adopt course and credit requirements, including technology and physical education skill requirements | ✓ | ✓ | | | | |
| Recommend/Adopt seat time requirements | ✓ | ✓ | | | | |
| Recommend/Adopt opportunities for student acceleration/remediation | ✓ | ✓ | | | | |
| Create or modify Career Pathway curricula | ✓ | ✓ | | | | |
| Choose dual enrollment options | ✓ | ✓ | | | | |
| Choose credit recovery options | ✓ | ✓ | | | | |
| Utilize online learning platforms (e.g., Georgia Virtual School) | | ✓ | | | | |
| Establish additional mastery level requirements for performance | ✓ | ✓ | | | | |
| Select additional formative and/or summative assessments to determine student levels of mastery and growth | ✓ | ✓ | | | | |

| **Curriculum and Instruction** *(continued)* | Charter School Nonprofit Governing Board | Charter School Management | Local School District* | Post-Secondary Education Partner(s) (if applicable) | Business Partner(s) (if applicable) | Community Partner(s) (if applicable) |
|---|:---:|:---:|:---:|:---:|:---:|:---:|
| Establish delivery model, scheduling, staffing, and supplemental services for English Learner (EL), special education (SPED), gifted, and remedial programs | ✓ | ✓ | | | | |

**APPENDIX B – CHARTER FOR FULTON ACADEMY OF SCIENCE AND TECHNOLOGY (FAST)**

### Locally-Approved Charter School Partners Roles and Responsibilities Chart- Fulton Academy of Science and Technology

| | Charter School Nonprofit Governing Board | Charter School Management | Local School District* | Post-Secondary Education Partner(s) (if applicable) | Business Partner(s) (if applicable) | Community Partner(s) (if applicable) |
|---|---|---|---|---|---|---|
| Establish curriculum maps, pacing charts, and methods for monitoring the curriculum | | ✓ | | | | |
| Establish lesson plan requirements for teachers | | ✓ | | | | |
| Establish placement and promotion criteria | ✓ | ✓ | | | | |
| Set grading and reporting policies, plans, process, schedules, and formats | ✓ | ✓ | | | | |
| **Establishing and Monitoring the Achievement of School Improvement Goals** | **Charter School Nonprofit Governing Board** | **Charter School Management** | **Local School District*** | **Post-Secondary Education Partner(s) (if applicable)** | **Business Partner(s) (if applicable)** | **Community Partner(s) (if applicable)** |
| Complete self-assessment based on Georgia School Performance Standards | | ✓ | | | | |
| Develop actions, strategies, and interventions with faculty and staff (i.e., school improvement plan) | | ✓ | | | | |
| Set a timeline for implementing school improvement timeline | ✓ | ✓ | | | | |
| Set a budget for implementing school improvement timeline | ✓ | ✓ | | | | |
| Recommend/Approve school improvement plan and provide oversight of its implementation | ✓ | ✓ | | | | |
| Hold principal or school leader accountable for school improvement plan implementation and timeline | ✓ | | | | | |
| Hold faculty and staff accountable for school improvement plan implementation and timeline | | ✓ | | | | |
| Evaluate success of school improvement plan and recommend/make revisions as needed | ✓ | ✓ | | | | |
| Regularly communicate student and school performance data to all stakeholders | | ✓ | | | | |
| **School Operations** | **Charter School Nonprofit Governing Board** | **Charter School Management** | **Local School District*** | **Post-Secondary Education Partner(s) (if applicable)** | **Business Partner(s) (if applicable)** | **Community Partner(s) (if applicable)** |
| Provide input into school operations that are consistent with school improvement and charter goals, including establishing human resources policies, procedures, and | ✓ | ✓ | | | | |
| Establish work schedules of faculty and staff (e.g., hours per day, days per year, | | ✓ | | | | |
| Establish experience, training, and other matters related to substitute teachers | | ✓ | | | | |
| Recommend/Set school daily, weekly, and annual school calendar and class schedules, including length of school year, holidays, early release days, etc. | ✓ | ✓ | | | | |
| Recommend/Approve professional development vendors and resources | ✓ | ✓ | | | | |
| Manage day-to-day human resources | | ✓ | | | | |

**APPENDIX B – CHARTER FOR FULTON ACADEMY OF SCIENCE AND TECHNOLOGY (FAST)**

## Locally-Approved Charter School Partners Roles and Responsibilities Chart- Fulton Academy of Science and Technology

| | | | | | | |
|---|:---:|:---:|:---:|:---:|:---:|:---:|
| HR processing, including employment contracts and benefits administration | | ✓ | | | | |
| Recommend/Select co-curricular and extracurricular activities | ✓ | ✓ | | | | |
| Establish after-school and Saturday programs as needed | ✓ | ✓ | | | | |
| Set enrichment and/or advisory periods as needed | | ✓ | | | | |
| Establish field trips, including locations and date | | ✓ | | | | |
| Set class size and student-teacher ratios | ✓ | ✓ | | | | |
| Set staff-to-student ratios for non-class times (e.g., lunch, recess, specials, transitions) | ✓ | ✓ | | | | |
| Establish school partnerships for school growth | ✓ | ✓ | | | | |
| Develop communications strategies, including stakeholder surveys, parent involvement, volunteer support | ✓ | ✓ | | | | |
| Select/Approve vendors aligned with school needs | ✓ | ✓ | | | | |
| Manage transportation decisions, including authority to contract for transportation service | ✓ | ✓ | | | | |
| Select information systems (e.g., Student Information System, financial information systems) | ✓ | ✓ | | | | |
| Manage the facility or facilities that are owned and operated by the school system for use by the charter school | ✓ | ✓ | | | | |
| Approve/manage the food service agreement with a vendor or the school system | ✓ | ✓ | | | | |
| Establish school size | ✓ | ✓ | | | | |
| Establish school grade span different from typical primary, elementary, middle, and high public school models (e.g., 4-8, K-8, K-12) | ✓ | ✓ | | | | |
| Establish attendance policies | ✓ | ✓ | | | | |
| Establish student code of conduct and behavior policies, plans, processes, and formats | ✓ | ✓ | | | | |
| Adopt and implement a marketing plan that is inclusive in its recruitment and retention of all students | ✓ | ✓ | | | | |
| Ensure access to support to address the physical, social, financial, and emotional needs of students in the school | ✓ | ✓ | | | | |

*The LBOE retains its constitutional authority