UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| JANE DOE I AND JOHN DOE, Individually and as Next Friends of JANE DOE II, a Minor, | ) ) ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION NO.: |
| v. | ) ) | 1:23-cv-2666-SCJ |
| FOUNDING FOURTEEN, et al., | ) ) ) | |
| Defendants. | ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF DR. ELIZABETH L. JEGLIC, PH.D.**

Plaintiffs Jane Doe and John Doe, as Next Friends of Jane Doe II, respectfully request the Court to deny Defendants' Motion to Exclude the Testimony of Plaintiffs' Expert Witness (Doc. No. [95]) because Dr. Jeglic is qualified to give her opinions, her opinions are based on reliable methodology, and her opinions will assist the jury in understanding relevant issues of fact.

**FACTUAL BACKGROUND**

Plaintiffs retained expert witness Elizabeth L. Jeglic, Ph.D. ("Dr. Jeglic") to provide testimony regarding "consequences resulting from Robert Vandel's sexual grooming, harassment, and abuse of his student, Jane Doe II." (Doc. No. [96] at 5). In response, Defendants retained Dr. Tyler Whitney to rebut the opinions rendered by

1

Dr. Jeglic regarding these issues and subsequently filed a Motion to Exclude Dr. Jeglic's testimony (Doc. No. [95]).

Dr. Jeglic is an internationally renowned researcher and expert in the fields of sexual violence prevention, sexual grooming, child sexual abuse, and sexual assault. (Doc. No. [96-1] at 4; Doc. No. [97] at 43:2–6). She is a licensed clinical psychologist, Professor of Psychology at John Jay College of Criminal Justice, City University of New York, and the author of over 150 books, articles, and book chapters in her relevant fields of study. (Id.)

In this case, Dr. Jeglic provided the following opinions:

A. Robert Vandel engaged in sexual grooming behaviors with Jane Doe II.

B. Robert Vandel sexually abused Jane Doe II while she was a student at FAST.

C. Jane Doe II has and will suffer negative short- and long-term consequences from Robert Vandel's psychological manipulation, sexual grooming, sexual harassment, and sexual abuse.

D. Jane Doe II has and will suffer short- and long-term psychological consequences from the betrayal of trust by her middle school teacher at FAST (an adult in a position of trust and the institution he represented).

E. Jane Doe II has and will suffer negative short- and long-term consequences from the student bullying that resulted at FAST from Robert Vandel's grooming behavior.

(Doc. No. [96-1] at 2–12).

In forming her opinions, Dr. Jeglic relied on her extensive experience, education, and expertise in the areas of child sexual abuse, sexual grooming, and sexual harassment—subjects at the heart of this litigation. Specifically, Dr. Jeglic provided the following bases for her opinions, each of which are supported by a myriad of scientific literature:

A. Almost all childhood sexual abuse ("CSA") involves the use of sexual grooming.

B. Sexual grooming involves the psychological manipulation of the victim resulting in negative short- and long-term consequences.

C. Sexual Grooming constitutes a betrayal of trust by an adult in a position of trust such as an educator and the institutions they represent, which can lead to both short- and long-term psychological consequences.

D. Educator sexual misconduct and sexual harassment can lead to negative short- and long-term consequences for victims.

E. Educator Grooming Behavior can lead to student bullying which results in negative short- and long-term consequences.

F. There are well established short- and long-term negative psychological, physical, psychosocial, and socioeconomic consequences of childhood sexual abuse.

(Doc. No. [96-1] at 12–16).

As shown below, Dr. Jeglic is qualified to render her opinions in this case, her testimony is the product of reliable principles, and her opinions will assist the jury in assessing Jane Doe II's damages. Defendants' Motion should therefore be denied.

## LEGAL ARGUMENT

### I. The Familiar Daubert/Rule 702 Framework

Federal Rule of Evidence 702, and the well-established Daubert/Kuhmo Tire/Joiner trilogy, require that an expert be qualified to give his or her opinions, that those opinions have been reached via a reliable methodology, and that those opinions will assist the trier of fact. Moore v. Intuitive Surgical, Inc., 995 F.3d 839, 850 (11th Cir. 2021) (reiterating the traditional Daubert "trifecta").

The trial court's role is to act as a "gatekeeper," under traditional parlance. Kilpatrick v. Breg, Inc., 613 F.3d 1329, 1335 (11th Cir. 2010). But the trial court's "gatekeeping role . . . is not intended to supplant the adversary system or the role of the jury." Allison v. McGhan Med. Corp., 184 F.3d 1300, 1311 (11th Cir. 1999). Instead, "vigorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Moore, 995 F.3d at 850; U.S. v. Frazier, 387 F.3d 1244, 1272 (11th Cir. 2004) (en banc).

At base, "it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the evidence." United States ex rel. Raven v. Georgia Cancer Specialists I, P.C., No. 1:11-CV-00994-CAP, 2018 WL 11220441, at *1 (N.D. Ga.

July 3, 2018). For these reasons, "the rejection of expert testimony [under Daubert] is the exception rather than the rule." Moore, 995 F.3d at 850 (citing Fed. R. Evid. 702, 2000 Advisory Committee Notes).

In fact, this Court frequently notes that "Rule 702 takes a liberal view of expert witness qualifications." See, e.g., U.S. ex rel. Raven, 2018 U.S. Dist. LEXIS 241084, at *7; see also Leathers v. Pfizer, Inc., 233 F.R.D. 687, 692 (N.D. Ga. 2006) (same). In practice, this means that "gaps in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony not its admissibility." Ga. Cancer Specialists I, P.C., 2018 U.S. Dist. LEXIS 241084, at *7. In addition, a mere conflict between an expert's proffered testimony and the underlying evidence is insufficient to disqualify an expert; again, this "goes to the weight—not admissibility—of the expert's testimony." See e.g., Giusto v. Int'l Paper Co., 571 F. Supp. 3d 1346, 1362 (N.D. Ga. Nov. 23, 2021) (citing Cameron v. Teeberry Logistics, LLC, 2013 WL 7874709, at *9-11 (N.D. Ga. May 21, 2013).

**II.   Dr. Jeglic is Qualified to Render Her Opinions.**

Rule 702 requires that an expert be "competent and qualified by knowledge, skill, experience, training, or education to render the opinion." Leathers v. Pfizer, Inc., 233 F.R.D. 687, 692 (N.D. Ga. 2006) (cleaned up). See also Fed. R. Evid. 702. As a licensed clinical psychologist and a leading scholar in the fields of sexual

violence prevention, sexual grooming, child sexual abuse, and sexual assault, Dr. Jeglic is more than qualified to render her opinions in this case.

Defendants do not, and cannot, contest that Dr. Jeglic is qualified to render her expert opinions with regard to sexual abuse and sexual grooming. See Doc. No. [97] at 44:15–19. Defendants do, however, argue that "Dr. Jeglic is not an expert qualified to testify regarding the causes of bullying and its impacts" such that her opinion regarding bullying should be excluded. (Doc. No. [95] at 24).

The opinion, that "Jane Doe II has and will suffer negative short- and long-term consequences from the student bullying that resulted at FAST from Robert Vandel's grooming behavior," is supported by Dr. Jeglic's observations that "Robert Vandel's sexual grooming of Jane Doe II was observed by other students at FAST, which resulted in other students bullying Jane Doe II because of the perceived favoritism and attention," and that "[t]he bullying Jane Doe II was subjected to caused her lasting anxiety and general social withdrawal, and resulted in her having to change schools." (Doc. No. [96-1] at 16).

Dr. Jeglic's research is into the effects of childhood sexual abuse in the school setting overlaps significantly with the issue of bullying. Dr. Jeglic testified to the strong correlation between sexual grooming and bullying as supported by her referenced scientific literature, i.e., that educator sexual grooming behavior

6

increases the likelihood of student bullying due to perceived favoritism and attention from the teacher. (Doc. No. [96-1] at 9). Dr. Jeglic also testified to the specific connection of this idea to the facts of this case. In support, Dr. Jeglic relied on Jane Doe II's counseling records, Jane Doe II's written account of her personal experience with the bullying and abuse she suffered. (Doc. No. [96-1] at 16, App'x B). Again, there is no dispute that Dr. Jeglic is a qualified expert with regard to sexual grooming. If anything, the strength of Dr. Jeglic's opinion on the connection between Jane Doe II's grooming and bullying will be determined by the trier of fact tasked to evaluate the weight and credibility of her testimony. Accordingly, because Dr. Jeglic's opinion regarding the impacts of Jane Doe II's bullying that resulted from Robert Vandel's grooming behaviors does, in fact, arise from an area of her expertise, Dr. Jeglic is sufficiently qualified to render this and all her opinions.

**III.    Dr. Jeglic's Opinions are Based on a Reliable Methodology**

When evaluating the reliability of either scientific or non-scientific, experience-based opinions, "the trial judge must assess 'whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue.'" SIS, LLC v. Stoneridge Holdings, Inc., No. 1:17-CV-01816-SDG, 2021 WL 2650355, at *3 (N.D. Ga. May 28, 2021) (quoting Frazier, 387 F.3d at 1261-62). "[T]he Court has

7

'considerable leeway' in deciding how to test the reliability of expert witness evidence" and "[e]xactly *how* reliability is evaluated may vary from case to case." Id.

Dr. Jeglic opined that Jane Doe II has suffered short-term consequences from Robert Vandel's psychological manipulation, sexual grooming, sexual harassment, sexual abuse, and betrayal of trust, and that she is more likely than not to suffer long-term consequences.[1] Dr. Jeglic formed these opinions by relying on the facts of this case, including Jane Doe II's counseling records, notes from licensed professionals, personally written statements about the abuse and its aftermath effects on her, a forensic interview completed by the Lead Forensic Specialist at Children's Hospital of Atlanta, and deposition testimony from Jane Doe II and both of her parents. (See Doc. No. [96-1] at 51). Dr. Jeglic then applied the facts of Jane Doe II's sexual trauma to her extensive library of data-backed, peer-reviewed research to opine on Jane Doe II's damages that have and will likely result therefrom. See id. at 7–8. Dr. Jeglic's reasoning of observing displayed characteristics and applying them to applicable, well-supported research to reach a conclusion, as both scientifically valid

---

1   Defendants represent that Dr. Jeglic spoke in absolute terms that Jane Doe II when they summarize that Dr. Jeglic testified that Jane Doe II "***will*** suffer future adverse consequences of Vandel's alleged actions." Doc. 95 at 9 (emphasis supplied). Dr. Jeglic repeatedly clarified in her deposition that her opinion is that it is more likely than not that Jane Doe II will suffer those consequences. See, e.g., Doc. No. [96] at 121:1–15.

8

and as applied to the facts of this case, is reliable under Daubert standards.

Defendants argue the unreliability of Dr. Jeglic's "opinions regarding the impact of Vandel's *alleged* abuse." (Doc. No. [95] at 7) (emphasis added). To be sure, there is simply nothing "alleged" about the sexual abuse Jane Doe II suffered at the hands of her science teacher, Robert Vandel, while she was a student at FAST. Defendants conveniently ignore the fact that Robert Vandel has, in fact, pled guilty to the sexual abuse of Jane Doe II, a crime for which he is serving a 10-year sentence. Defendants go so far as to critique Dr. Jeglic for not considering how "there was *only* one event of sexual abuse allegedly perpetrated by Vandel against Jane Doe II," (Mot. p. 10) (emphasis added), but ignore her testimony that "there's really no research that suggests that that factors into the severity of the consequences." (Doc. No. [96] at 75–76). Defendants' continuous downplaying and diminishing of the existence and impact of the sexual abuse Robert Vandel committed against Jane Doe II when she was just 12 years old is misplaced and inappropriate.

Defendants proceed to argue that Dr. Jeglic's opinions are unreliable because Dr. Jeglic did not personally interview Jane Doe II. They argue that her methodology of "refusing to interview the victim" is not scientifically supported, peer reviewed, or subject to a known error rate. (Doc. No. [95] at 10). However, Defendants mischaracterize Dr. Jeglic's testimony. In fact, Dr. Jeglic reviewed every piece of

9

material she needed to formulate her opinions in this case. As she explained in her deposition, Dr. Jeglic saw no need to subject Jane Doe II to yet another clinical interview to formulate her opinions as to the past and future consequences Jane Doe II has and will suffer as a result of her sexual grooming, harassment, and abuse. (Doc. No. [96] at 24–25). Such an examination would not only force Jane Doe II to relive the sexual trauma she has endured and continues to live with, but would also only show Jane Doe II's account of her trauma *at that moment in time*, nearly five years later. Such an interview would thus not be necessary to opine on the likelihood that Jane Doe II would experience future psychological harm. Instead, Dr. Jeglic took into account in forming her opinions statements by and observations of Jane Doe II all throughout these previous years to paint a much more accurate and complete picture of the grooming, harassment, and abuse she suffered, as well as the consequences that have resulted therefrom before applying Jane Doe II's case to the relevant research literature. (Id.).

Defendants next argue that Dr. Jeglic must identify a specific study that demonstrates that she can opine on the negative consequences of childhood sexual assault without interviewing the victim herself. (Doc. No. [95] at 10.) Defendants then quote Dr. Jeglic's testimony as if she conceded that she "cannot give you an exact study . . . ." Id. (citing Jeglic Dep. at 119) (ellipsis supplied). Defendants

10

truncate Dr. Jeglic's answer, but she then continued to explain why interviewing a victim does not provide insight into the future psychological harm. She testified that there is "trauma literature" showing how "[p]eople who experienced abuse don't necessarily recognize the degree to which it impacts them," thus why it is best "to look at, more broadly, what we know about the long-term consequences of child sexual abuse." Doc. No. [96] at 119:11–120:9.

Accordingly, there was no scientific need to interview Jane Doe II. A victim of childhood sexual assault is not capable of providing information about how the experience will affect her in the future because it depends on factors that the victim does not understand. Courts have routinely admitted Daubert testimony that is based on a review of medical records and other information gathered by third parties. "The fact that a physician has not examined the plaintiff does not necessitate a finding that any such expert report or testimony offered by the physician is inadmissible under Daubert." Rafferty v. Erhard, No. 09CV1019, 2012 WL 2577473, at *7 (W.D.N.Y. July 3, 2012) (citing Giladi v. Strauch, 2007 WL 415365 (S.D.N.Y.2007) and Carroll v. Morgan, 17 F.3d 787 (5th Cir. 1994)).

Dr. Jeglic therefore followed her usual process in *choosing* to not force Jane Doe II to undergo an unnecessary interview because the scientifically-supported research and immense amounts of data show that, like all victims of childhood

11

sexual assault, Jane Doe II has, and likely will, experience short- and long-term consequences as a result of that trauma. As Dr. Jeglic testified, "how else [would one] look at the future consequences to someone without looking at the research literature"? (Doc. No. [96] at 125). Dr. Jeglic's reasoning is thus anything but unreliable.

Defendants also argue that Dr. Jeglic failed to cite studies that show that there is no correlation between the frequency or severity of abuse and the severity of negative life outcomes for the victim. Doc. No. [95] at 10. But here, Defendants have seized on a specific question that has not been studied, and ignored the wealth of scientific literature—including studies authored by Dr. Jeglic—that show the consequences of childhood sexual abuse faced by a student like Jane Doe II. See Jeglic Rep. ¶ D.23; Doc. No. [96] at 75–76.

Finally, Defendants argue also that "Dr. Jeglic's opinion is improperly supported by Jane Doe II's speculation regarding what motivated the students who bullied her." Doc. No. [95] at 24 (citing Jeglic Dep. 126–27). But, first, as a "general rule, the factual basis of an expert's opinion goes to the credibility or weight of the testimony rather than its admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." Larson v. Kempker, 414 F.3d 936, 941 (8th Cir. 2005) (quotation and citation omitted).

12

Second, there *is* a factual basis for Dr. Jeglic's opinion. For example, Jane Doe II specifically testified about the reason she believed the bullying was motivated by Vandel's predatory behavior:

> Q. Okay. My question for you is, do you know for sure that the fact that you were getting a hard time from these kids had to do with the conduct of Mr. Vandel?
>
> A. Yes.
>
> Q. Tell me how you know that.
>
> A. Well, I know for a fact that a lot of the bullying kind of had to do with jealousy and they -- a lot of the girls in particular were -- they were jealous that I was getting a lot of attention from Mr. Vandel.
>
> And then there was also -- somebody had posted something on their SnapChat story about -- I don't know who it was; but somebody was, like, suspicious about the fact that, like, I was in his room by myself and they were, like, making fun of me for it.

See Doc. No. [102] at 78:5–21. While Defendants may argue to the jury that Jane Doe II's bullying was unrelated to Vandel's abuse, the evidence in the record provides a basis for Dr. Jeglic's opinion. It is not appropriate to exclude otherwise admissible expert testimony on the basis that the opposing party disagrees with the facts or evidence considered. Pods Enterprises, Inc. v. U-Haul Int'l, Inc., 2014 WL

13

2625297, at *3 (M.D. Fla. June 12, 2014).[2]

Finally, Defendants attack Dr. Jeglic's years of experience and expertise by citing a single published literature review provided by their rebuttal expert, Dr. Whitney, who is an expert in autism. See Doc. No. [96-2]. Defendants wrongly claim this paper (the "Domhardt literature review") shows—to a scientific certainty—that there is 10 to 53 percent likelihood that a victim of childhood sexual abuse would suffer negative outcomes. Therefore, they argue that Dr. Jeglic could not possibly reach a different conclusion. The problem is that, like their own expert, Defendants are misrepresenting the contents of that paper. The actual quote reads: "[In the studies included in this review, the percentage of [childhood sexual abuse] survivors who were found to have a normal level of functioning despite a history of sexual abuse ranged from 10% to 53%." See Doc. No. [96-2] at 1. The phrase "normal level of functioning" does not mean the same thing as "suffering negative consequences." It is obviously possible for a person to suffer negative psychological consequences of an event while still maintaining "normal levels of functioning." The article itself also acknowledged that the "short- and long-term

---

[2] As if to underscore that their argument is a factual one for trial, Defendants argue that "[n]one of the FAST administrators who actually investigated and attempted to intervene in the bullying of Jane Doe II ever received any suggestion that the bullying had anything to do with any teacher—much less Vandel." Doc. No. [95] at 24. These are factual arguments for the jury; they are not arguments that support excluding an expert's opinion.

14

sequelae after [childhood sexual abuse] are evidenced as a wide range of mental disorders, including post-traumatic stress disorder, depression, anxiety, aggression, and substance abuse." Doc. No. [96-2] at 1. The Domhardt literature review does not discuss a single study that states that it is impossible to determine the likelihood that a victim of childhood sexual abuse will experience future negative effects. It simply does not support Defendants' rebuttal testimony. Even if the Domhardt literature review stood for the proposition that Defendants claim, it does little more than show that not every psychologist agrees with Dr. Jeglic's conclusion. But that is not a basis to exclude her opinion.

## IV. Dr. Jeglic's Opinions Will Assist the Jury

District courts in the Eleventh Circuit have determined that "[o]nly if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." Mann v. Taser International, Inc., 2007 WL 9712075, at *7 (N.D. Ga. Dec. 27, 2007). Dr. Jeglic's opinions in this case are far from such a stringent standard, and will, in fact, be helpful to a jury to understand the issues at play.

Plaintiffs' claims in this case, rooted in Title IX and § 1983 Equal Protection Clause, center around the violation and deprivation of Jane Doe II's constitutional right to be free from sexual harassment in school. It is undisputed that Dr. Jeglic is

15

among the world's top experts in the areas of child sexual abuse, sexual grooming, and sexual harassment. (See Doc. No. [97] at 44). Accordingly, because it is Plaintiffs' sincere hope that members of a lay jury would not be familiar with the intricacies of such sensitive subjects, including the consequences that victims like Jane Doe II experience after suffering such trauma, expert testimony from Dr. Jeglic will be helpful to a jury to understand the sexual harassment that Jane Doe II endured while she was a student at FAST, how it has affected her psychologically, and how it will continue to affect her for the rest of her life.

Defendants, however, argue Dr. Jeglic's opinions on sexual grooming specifically should be excluded in their entirety, claiming that her opinions "would simply confuse the jury" because "grooming behavior is not a legal issue in this case." (Doc. No. [95] at 20). Defendants again mischaracterize Dr. Jeglic's testimony. The sexual grooming behavior that Dr. Jeglic opines about in her report includes Robert Vandel's repeated touching of, compliments and nicknames given to, and other harassing behavior made toward Jane Doe II that ultimately led to and surrounded the sexual assault of his smacking her on the buttocks with a yardstick.

First, this testimony will be helpful to the jury in assessing Jane Doe II's damages. When Jane Doe II reflects on her time at FAST, part of the psychological harm is that she was groomed by a sexual predator who slowly wore down her

defenses, and acclimated her to greater levels of abuse. While Jane Doe II can describe the underlying facts to a jury, she is not in a position to explain this grooming process to a jury, nor can she testify as to how Vandel's behavior fits within the modus operandi of sexual predators. See Doe by & through Pike v. Pike, 405 F. Supp. 3d 243, 251 (D. Mass. 2019) ("Courts have generally recognized that expert testimony regarding sexual abusers' modus operandi can assist the jury.").

Second, testimony regarding grooming is relevant to FAST's failure to prevent, recognize, and stop it, which is the heart of this case and the basis for Plaintiff's claims. Indeed, encompassed in Robert Vandel's grooming behaviors is the repeated touching, caressing, and massaging of Jane Doe II's shoulders—the harassment that Jane Doe II reported to Defendant Beiner on December 2, 2019. Additional details of the contents of this report remain in dispute at this stage of litigation. However, Defendants' claim that Dr. Jeglic's opinions on "grooming" are irrelevant and would be unhelpful to a jury are plainly ungrounded, and will instead help the jury understand how invidious Vandel's conduct was and the psychological harm that flows from it.

Defendants finally argue that Dr. Jeglic's opinion concerning grooming should be excluded under Rule 403 because it will confuse the jury. While a Rule 403 objection is likely better to resolve in the context of a motion in limine rather

17

than a Rule 702 motion, here it is meritless. First, Defendants argue that Dr. Jeglic's opinion concerning grooming would confuse the jury because none of Defendants were aware of that conduct. But that is a disputed issue of fact; it is not a basis for excluding testimony. Defendants also argue that because some of Dr. Jeglic's research occurred after the events at issue in this this case, "introducing those concepts at trial would unfairly imply that Defendants should have known about those concepts in their dealings with Vandel." Doc. No. [95] at 23. But the timing of Dr. Jeglic's research has nothing to do with the validity of it, and Dr. Jeglic does not offer any opinion about whether Defendants knew or should have known about Vandel's conduct. Her testimony is instead focused on the psychological harm suffered by Jane Doe II.

## CONCLUSION

Because Dr. Jeglic is qualified to render her testimony, and her opinions are reliable and helpful to a lay jury, the Court should DENY Defendants' Motion in its entirety.

Respectfully submitted this 27th day of January, 2025.


[Signatures appear on the following page.]

|  |  |
|---|---|
|  | **SPEARS & FILIPOVITS, LLC** |
|  | **Jeff Filipovits** |
|  | Jeff Filipovits |
|  | Georgia Bar No. 825553 |
|  | Brian Spears |
|  | Georgia Bar No. 670112 |
| 315 W. Ponce de Leon Ave. |  |
| Suite 865 |  |
| Decatur, GA 30030 |  |
| 404-905-2225 |  |
| jeff@civil-rights.law |  |
| bspears@civil-rights.law |  |
|  | **MOORE HALL, LLC** |
|  | Michael J. Moore |
|  | Georgia Bar No. 520109 |
|  | Aimee J. Hall |
|  | Georgia Bar No. 318048 |
|  | Michaela E. Fuller |
|  | Georgia Bar No. 253788 |
| 1189 S. Ponce de Leon Ave NE |  |
| Atlanta, Georgia 30306 |  |
| (404) 882-2960 |  |
| mjmoore@moorehall.com |  |
| ajhall@moorehall.pcom |  |
| mefuller@moorehall.com |  |
|  | *Counsel for Plaintiffs* |

## **CERTIFICATE OF COMPLIANCE**

Counsel hereby certifies that this document has been prepared in compliance with Local Rule 5.1C using 14-point Times New Roman font.

This 27th day of January, 2025.

**SPEARS & FILIPOVITS, LLC**

**Jeff Filipovits**
Jeff Filipovits
Georgia Bar No. 825553

315 W. Ponce de Leon Ave.
Suite 865
Decatur, GA 30030
404-905-2225
jeff@civil-rights.law